2020 IL App (1st) 163430-U

No. 1-16-3430

Order filed November 25, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 15376 |
| | ) | |
| TIMOTHY JONES, | ) | Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the judgment of the circuit court over defendant's contentions that the State failed to prove him guilty beyond a reasonable doubt, that the court erred in denying his motion for a new trial based on the deficient performance of his trial counsel, that his sentence violates the proportionate penalties clause of the Illinois Constitution, and that his sentence is excessive.

¶ 2    Following a jury trial, defendant Timothy Jones was found guilty of the first degree murder of Charinez Jefferson (Charinez) and that defendant personally discharged a firearm in the commission of that offense, which proximately caused death. The jury further found defendant

guilty of aggravated discharge of a firearm. At a subsequent sentencing hearing, the trial court sentenced defendant to a term of 55 years' imprisonment on the first degree murder count, with a mandatory, consecutive 25-year term for personally discharging a firearm that proximately caused death, and a consecutive 10-year term for aggravated discharge of a firearm, for a total aggregate term of imprisonment of 90 years. On appeal, defendant raises four primary contentions. First, defendant contends that the State failed to prove him guilty beyond a reasonable doubt where the evidence the State presented of the identity of the shooter was unreliable and inconsistent. Second, defendant contends that the trial court erred in denying his motion for a new trial based on the ineffective assistance of his trial counsel where trial counsel failed to investigate and present his alibi defense. Third, defendant asserts that his 90-year sentence violates the proportionate penalties clause of the Illinois Constitution because the trial court failed to consider his youth and its attendant characteristics in accordance with the United States Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. 460 (2012) in determining his sentence. Finally, he alternatively claims that his sentence is excessive because the court failed to consider the mitigating factors presented, including his youth, his learning disability, and his rehabilitative potential.

¶ 3                                    I. BACKGROUND

¶ 4       The circumstances surrounding Charinez's murder on August 16, 2011, are not in dispute. The only point of contention on the undisputed facts is the identity of the shooter. The record shows that around 1 a.m. on August 16, 2011, defendant was shot in the thigh near West 62nd Street and South Western Avenue. He was treated at the hospital and released a few hours later around 3 a.m. Later that day, at 10:30 p.m. Charinez and Jeremy Martin (Jeremy) were walking south on Whipple Street when a person ran across the street firing a gun at them. Jeremy turned and ran as the gunman approached, but Charinez did not move. The gunman fired twice in Jeremy's

direction and then turned to Charinez and shot her. The assailant then stood over Charinez and shot her five to seven more times. Shirley Vantrease (Shirley) testified that she was sitting in front of a building with some friends on the corner of 64th Street and Whipple Street when she saw Charinez and Jeremy walking south on Whipple Street. Shirley testified that while Charinez and Jeremy were walking toward Charinez's house, "a boy came up and started shooting" at them. Shirley testified that the "boy" was not wearing a shirt, but was wearing "a little low hat and short capri's [*sic*]." Shirley could see the gun in the boy's hand, but she could not see his face.

¶ 5     Romell Vantrease (Romell), Shirley's brother, testified that he was currently being held in custody in the Cook County Jail because he did not want to appear as a witness in this case. Romell testified that on the night of the incident he had been drinking at his mother's house and had "maybe three or four beers and like two shots of vodka." He acknowledged, however, that he told a police detective and an assistant State's attorney (ASA) that he drank only "two beers and one shot of vodka" that night. Romell testified that he was drunk that night, but he was nonetheless able to see everything clearly and remember everything clearly. After leaving his mother's house, Romell walked down the block to the corner of 64th Street and Whipple Street. There, he saw his sister, Shirley, sitting with some friends in front of a building. He also saw Charinez and Jeremy walking down the street about 25 feet away from him. On the corner, Romell saw defendant wearing "blue jean shorts and a white t-shirt" and a black hat. Defendant was holding a handgun.

¶ 6     Romell had known defendant since he was a "little kid." Romell testified that defendant was in a gang called "Hit Squad," but he told detectives in August 2011 that defendant was a member of the "Rockwell G-D" street gang. Romell saw defendant run across the street, shoot at Jeremy, and then shoot Charinez. Romell testified that after defendant shot Charinez, defendant ran from the scene into a Kia truck and drove away. Romell walked over to Charinez, saw that she

was dead and called the police. Police officers arrived on the scene and Romell told Chicago police Sergeant John Foster that he recognized the shooter as "Little Tim." Sergeant Foster showed Romell a series of photographs on the computer in his vehicle and Romell identified defendant in the photographs as the shooter. A few days later, Romell went the police station where he identified defendant as the shooter in a photograph array and in a lineup.

¶ 7    Jeremy testified that he was also currently in custody in the Cook County Jail because he had moved out of state since the shooting and the court found him to be a material witness in the case. Jeremy testified that he used to a member of the Rec City street gang when he lived in Chicago. In 2011, there were problems between Rec City and another gang called Scrapville Boys or Rockwell Boys. On the night of the shooting, he saw Charinez after he finished playing basketball and the two of them walked to a nearby "convenient [*sic*] store." Afterward, they walked to a gas station so that Jeremy could buy some "Swishers." They then started walking south on Whipple Street toward 64th Street. When they reached the corner, Jeremy saw a "guy with his hat low, no shirt and brown shorts." Jeremy could not see his face. Jeremy did not think the guy was "supposed to be there" because he had never seen him before.

¶ 8    Jeremy asked him, "who the f*** is that?" but the man did not respond. Instead, he pulled a gun out of his front pocket and shot at Jeremy twice. Jeremy turned and ran, but did not hear any gunshots after that. When Jeremy had run almost to the next block, he stopped, turned around, and saw "Charinez getting gunned down." The man with the gun was standing over Charinez, calling her a "b****," and repeatedly shooting her. The man shot Charinez four or five times while she was on the ground. Jeremy started to run back toward the man with a gun, but he ran off before Jeremy could get a look at his face. Jeremy went to tell the father of Charinez's baby what happened and then returned to the scene where he spoke to police. Sergeant Foster testified that

Jeremy told him that he was not comfortable speaking with the police in front of a crowd, but told him that he knew who the shooter was and gave him his contact information. Jeremy denied telling Sergeant Foster that he knew the identity of the shooter.

¶ 9 The State then impeached Jeremy's testimony that he did not recognize the shooter with his testimony at the grand jury proceeding, his statements made in a videotaped statement to an ASA, and his identifications of defendant in a photograph array and in a lineup. Jeremy acknowledged that the day after the shooting, he went to the police station to speak to the police. Jeremy told the detectives that he was about 20 feet away from the shooting. He told the detectives that when he turned around to look at the shooter, he recognized defendant as the person shooting Charinez. Detectives then showed Jeremy a photograph array and Jeremy signed a picture of defendant, identifying him as the shooter. The next day, Jeremy returned to the police station because he was arrested for failing to register as a gun offender. Jeremy talked to an ASA and gave a videotaped statement. Jeremy told the ASA that when he ran back toward the shooter after he shot Charinez, the shooter looked up at him and he could see his eyes. When Jeremy saw the shooters eyes, he knew it was defendant. Jeremy told the ASA that he was "100 percent sure that it was [defendant] who shot at [him] and shot at Charinez." A few days later, Jeremy returned to the police station to view a lineup. At the lineup, he identified defendant as the person who shot Charinez.

¶ 10 Jeremy further acknowledged that he later testified before a grand jury. In his grand jury testimony, he identified defendant as the shooter and testified that he knew him because he was a "fellow rival gang member of mine." Jeremy also identified defendant in a photograph as the shooter. Jeremy then identified defendant in court as the person he identified as the shooter in the videotaped statement, his grand jury testimony, the photograph array, and the lineup. Jeremy

further testified that he told the ASA that he initially did not talk to the police officers who arrived on the scene of the shooting because he was scared to talk in front of the other people on the street. However, he eventually agreed to tell the ASA about defendant shooting Charinez because he wanted to give Charinez's mother some closure and because "it was the right thing to do." Jeremy testified that was nonetheless scared for his safety because "if someone can kill a pregnant girl. I know they wouldn't care about killing my mother or my sisters or my aunts."

¶ 11    On cross-examination, Jeremy testified that he told a different ASA that the police threatened to charge him with possession of "bullets" and "weed" and send him to prison for 10 years if he did not speak to them about Charinez's murder. He testified that he told the ASA in the videotaped statement that the police did not threaten him because he was "scared they would still charge me with the gun [*sic*] if I didn't cooperate."

¶ 12    Chicago police detective Anthony Amato testified that he was a gang detective and was qualified as an expert in the field of gang intelligence. Detective Amato testified that he was familiar with defendant before the events in this case. Detective Amato and other CPD officers arrested defendant in the early morning hours of August 20, 2011. Detective Amato noted that defendant was limping at the time of the arrest because he had been shot a few days earlier. He testified that Jeremy was part of the Rec City street gang and that defendant was affiliated with the Rockwell Boys, also known as the Scrapville Boys, and the GDs. He further testified that in 2010 and 2011 Rec City and the Rockwell Boys were "basically at war with each other."

¶ 13    After the State rested, the court engaged in a colloquy with defendant regarding his right to testify and his satisfaction with the performance of his trial counsel, Tod Urban. Defendant voluntarily waived his right to testify. With regard to his counsel's performance, the court asked:

"THE COURT: Do you have any additional evidence that Mr. Urban has not offered that you wish to be offered?

THE DEFENDANT: No.

THE COURT: Obviously you're satisfied with Mr. Urban's work on this case; is that right?

THE DEFENDANT: Yes."

¶ 14    Ericka Clark (Ericka), defendant's sister, testified on defendant's behalf that she went to the hospital with him on August 16 after he was shot. When they returned home from the hospital, defendant went into the basement to his bedroom. She saw him later that day and went to get his pain medication from the pharmacy.

¶ 15    Following closing argument, the jury found defendant guilty of first degree murder, during which he personally discharged a firearm that proximately caused death, and aggravated discharge of a firearm. Following the jury's verdict, defense counsel filed leave to withdraw and defendant obtained new counsel to represent him. Defendant filed, through his new counsel, a motion for a new trial and other posttrial relief in which alleged, *inter alia*, that his trial counsel, Urban, had provided ineffective assistance in failing to investigate and present an alibi defense. Defendant asserted that "months before trial" Urban was aware that two of defendant's sisters, Cynthia Jones (Cynthia) and Ericka, as well as defendant's fiancé, Dakota Harris, could testify "to certain circumstances preceding Defendant's arrest that would create reasonable doubt sufficient to exonerate him." Defendant attached to his motion affidavits from Ericka, Cynthia, and Harris. The three affidavits contained largely the same information. The women asserted that after defendant was shot in the early morning hours of August 16, 2011, the three of them drove defendant home from the hospital. Defendant then did not leave the family home until he was arrested for

Charinez's shooting four days later on August 20, 2011. Under the timeline of events presented in the affidavits, defendant would have been at home during Charinez's shooting.

¶ 16     At the hearing on defendant's motion, Urban testified that he discussed the evidence with defendant during the pendency of the case and they talked about witnesses "on several occasions," but that defendant talked about witnesses more with Urban's associate, Nichole Massarello. Defendant did not instruct Urban to present any evidence at trial, but did give him and Massarello names of witnesses. Massarello testified that defendant never directed her to contact any witnesses about a potential alibi. She testified that she did not ask defendant if he had an alibi because she would expect that if a defendant had an alibi, he would tell her about it. In this case, she testified that defendant never told her that he was in his house during the shooting and therefore could not have shot Charinez.

¶ 17     Urban first learned Ericka and Cynthia were potential witnesses on the date the jury was selected and he interviewed them on that date. Defendant had never mentioned that Ericka or Cynthia were potential witnesses in the case prior to jury selection. Prior to that date, Urban had spoken to Ericka at nearly every court date and she had never mentioned being a potential witness prior to the jury selection. When defendant told Urban that Ericka was a potential witness, Urban spoke to her for about 15 minutes and asked her if she had any relevant testimony. He then spoke to her before trial on the date she testified to prepare her for her testimony. He also spoke to Cynthia for about 15 minutes and asked her if she had any relevant testimony. Urban testified that in all of his meetings with defendant, defendant never claimed he had an alibi. Urban testified that when he spoke to Ericka, she told him that she helped defendant come home from the hospital, he went downstairs to his bedroom "and she never saw him again and she left *** the house." Cynthia told Urban a similar series of events and told him that she did not know where defendant was "between

bringing him home from the hospital and when the murder was committed." Massarello similarly testified that when she spoke to Ericka, Ericka told her about picking defendant up from the hospital after he was shot, but never gave any information about an alibi for defendant. Neither Cynthia nor Ericka told Massarello that defendant did not leave the house between August 16 and August 20 and neither indicated that they had personal knowledge that defendant was in the house at the time of the shooting. Neither Urban nor Massarello had any knowledge of Harris or her alleged testimony.

¶ 18 Ericka testified at the hearing that she went with defendant to the hospital after he was shot. When defendant returned home, he laid down on the couch on the main floor of their home and stayed there all day. The next day, defendant complained about the pain in his leg and Ericka and Cynthia went to pick up his pain medication prescription from the pharmacy. She further testified that she was on the west side of Chicago when defendant was arrested. She testified that she told Urban that defendant was home from the time he was shot until he was arrested, but she did not recall whether Urban asked her any follow-up questions when she told him that information. Cynthia testified similarly to Ericka, adding that she knew that defendant never left the house after he was shot because she was "keeping an eye on him" to "make sure that he was okay." She testified that she never told Massarello about defendant being in the house for four days straight because Massarello never asked her.

¶ 19 Defendant testified that he directed Urban to talk to Cynthia and Ericka. He also testified that Urban spoke to Harris one time at the courthouse before coming to visit him in the lockup. Defendant testified that there were several other people who could verify that he did not leave his house during that four-day period, but he could not recall the names of every person who was present. Defendant testified that he was not satisfied with the evidence Urban presented at trial

despite the fact that he told the court that he was. Defendant testified that he was not satisfied with Urban's representation because Urban did not listen to what defendant told him to do.

¶ 20     In ruling on defendant's motion, the court found that Ericka and Cynthia's testimony was "inconsistent" and "illogical." The court stated that "[t]heir general nature and demeanor during the course of their testimony would have given any seasoned practitioner more than enough reluctance to call them as witnesses ***." Indeed, the court found that calling Ericka and Cynthia as witnesses would have been a "fatal error" because they were "terrible witnesses." With regard to defendant's testimony, the court found that defendant "ramble[d] incoherently on the witness stand" and did not even know the names of the potential witnesses who were alleged to have been with him at his house. The court noted that defendant had very little recollection of what he did and did not say to Urban during the course of the representation. The court noted that defendant indicated on the record that he was satisfied with Urban's performance and the court was "going to take him at his word on that." The court concluded that the question was whether the alleged alibi could ever be a viable defense. The court concluded that it could not because it was "poorly articulated because of the credibility of the witnesses involved." The court found that the allegations therefore did not meet the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984) and denied defendant's motion. This appeal follows.

¶ 21                                   II. ANALYSIS

¶ 22     On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt where the State's identification evidence was unreliable and there was no physical evidence linking defendant to the shooting. Defendant also contends that the court erred in denying his motion for a new trial based on trial counsel's ineffectiveness where defendant demonstrated that counsel was ineffective in failing to investigate and present defendant's alibi evidence and the

court improperly assessed the credibility of the witnesses at the hearing. Defendant further asserts that his 90-year sentence imposed for an offense committed when he was only 18 years old violates the proportionate penalties clause of the Illinois Constitution. In the alternative, defendant contends that his sentence is excessive in light of his young age and the other mitigating factors presented.

¶ 23                                    A. Sufficiency of the Identification

¶ 24    Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because the two eyewitnesses who identified him as the shooter gave inconsistent and unreliable testimony. Defendant asserts that Jeremy's testimony is unreliable because he testified at trial that he could not see the shooter's face, but was impeached by his prior inconsistent statements in which he identified defendant as the shooter. Defendant also asserts that Romell's testimony was incredible where he had been drinking and his trial testimony was not inconsistent with his grand jury testimony. Defendant maintains that the State therefore failed to meet its burden of proof where there was no other evidence linking him to the shooting.

¶ 25                                    1. *Standard of Review*

¶ 26    Where a defendant challenges the sufficiency of the evidence to sustain his conviction, the reviewing court must consider whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). This standard recognizes the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts and inconsistencies in the evidence, and to draw reasonable inferences therefrom. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the State, and will not

overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011); *People v. Smith*, 185 Ill. 2d 532, 542 (1999). In this case, defendant does not contest the elements of the charged offense, but instead challenges the sufficiency of the State's identification evidence. In particular, defendant challenges the reliability of Jeremy and Romell's identification as well as their credibility. We observe that it is well-settled that "[t]he sufficiency of identification testimony *** is a fact question for the jury, and the testimony of a single identification witness is sufficient to support a conviction if the witness viewed the accused under circumstances permitting a positive identification to be made." *People v. Palmer*, 125 Ill. App. 3d 703, 709 (1984).

¶ 27                                    2. *Romell's Identification*

¶ 28     We will first discuss the infirmities defendant alleges with regard to Romell's identification of defendant as the shooter. Defendant asserts that Romell's identification is unreliable because he had been drinking at the time of the shooting, testified inconsistently with his grand jury testimony, and identified defendant from 25 feet away even though his sister, who was near him, could not identify defendant from a similar distance. We observe that defendant's contentions concerning Romell's testimony appear to conflate the validity of the identification with the credibility of the witness.

            "Evidence showing either the identification was made under overly suggestive
        circumstances or the witness had an inadequate opportunity to view the accused destroys
        the validity of an identification. [citations]. This makes the identification vague, doubtful,
        or uncertain. Discrepancies or omissions of detail, however, do not destroy the validity of

an identification; rather, they go to the weight of the testimony and are evaluated by the trier of fact. [citation]." *Id.*

¶ 29    In this case, defendant's contentions concerning Romell's identification testimony concern discrepancies in his testimony, not the validity of the identification. Therefore, the inconsistencies in his testimony were matters for the jury to consider in determining the weight to be afforded to his testimony. We note that Romell testified that although he had been drinking that night and was intoxicated, it did not affect his ability to clearly see and recall the events. He also testified that he recognized defendant because he had known him since he was a "little kid." Romell consistently identified defendant as the shooter at the scene on the police computer, as confirmed by Sergeant Foster, at the police station in a photograph array and in a lineup, at the grand jury proceedings, and at trial. Although, as defendant points out, Romell's testimony of the ancillary details, such as how much he had to drink that night and defendant's clothing, changed over time, it was for the jury, as the trier of fact, to assess these variances in making a determination of defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 308 (1989). In this case, the jury appeared to credit Romell's testimony that defendant was the shooter despite the inconsistencies defendant identifies. We do not find such a determination to be so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Beauchamp*, 241 Ill. 2d at 8.

¶ 30                                    3. *Jeremy's Identification*

¶ 31    We will next address defendant's contentions concerning Jeremy's identification. As defendant points out, Jeremy testified at trial that he was unable to see the shooter's face and was thus unable to identify him. The State then confronted Jeremy with his prior testimony from the grand jury proceedings, his prior videotaped statement to an ASA, and his identification of defendant as the shooter in a photograph array and in a lineup. Defendant asserts that Jeremy's

identification of defendant is therefore unreliable where it was brought out only be impeaching Jeremy with his prior inconsistent statements. Defendant maintains that where Jeremy directly contradicted his previous identification of defendant in his trial testimony, the credibility of that evidence is greatly reduced. Defendant also points out that Jeremy indicated that he was threatened by police with felony charges if he did not speak to the police about the shooting. Defendant contends that this further erodes the credibility of his previous identifications of defendant where those identifications were given under duress.

¶ 32                              i. Identification by Prior Inconsistent Statements

¶ 33    Under section 115-10.1 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-10.1 (West 2016)) a witness's prior inconsistent statements can be considered substantive evidence in certain circumstances. Defendant does not dispute that Jeremy's prior inconsistent statements were properly admitted, but instead asserts that these previous statements were insufficient to sustain his conviction given the lack of corroborating evidence of his identity and the inherent unreliability of Jeremy's prior inconsistent statements given his recantation of the identification evidence at trial. As discussed, *supra*, however, Romell's identification of defendant as the shooter corroborates Jeremy's prior inconsistent statements where he unequivocally identified defendant as the shooter. Nonetheless, it is well settled that even where no corroborative evidence is presented "a recanted inconsistent statement admitted under section 115-10.1 can support a conviction." *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 23 (citing *People v. Craig*, 334 Ill. App. 3d 426 (2002), *People v. Morrow*, 303 Ill. App. 3d 671 (1999)). This is because, despite defendant's implications to the contrary, there are no "suspect categories" of properly admitted evidence that require a different standard of appellate review. *Craig*, 334 Ill. App. 3d at 439 (citing *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998)). "As such, evidence of prior inconsistent

statements properly admitted, even if later recanted, should be treated no differently" than other properly admitted trial evidence. *Id.* Thus, the properly admitted prior inconsistent statements were competent evidence for the jury to consider and weigh and were not inherently unreliable.

¶ 34 We find the same analysis applies with regards to defendant's contention that Jeremy's prior inconsistent statements were unreliable because they were allegedly made under duress. Defendant asserts that Jeremy only spoke with the detectives and provided a statement identifying defendant as the shooter because the police threatened him with felony charges. This court has recognized, however, that "if a prior statement meets section 115-10.1's test, 'a finding of reliability and voluntariness is automatically made. Accordingly, no additional analysis is needed. *** [I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony.' " *Morrow*, 303 Ill. App. 3d at 677 (quoting *People v. Pursley*, 284 Ill. App. 3d 597, 609 (1996)). In short, the jury's verdict suggests that it determined that Jeremy was telling the truth when he made his prior statements and was "lying at trial." *Craig*, 334 Ill. App. 3d at 440. We find nothing in the record to justify substituting this court's judgment for that of the jury on this matter.

¶ 35 The record shows that the day after the shooting, Jeremy told the detectives that he recognized defendant as the shooter and he went on to pick defendant out of a photograph array and out of a lineup. He told an ASA in a videotaped statement that he was "100 percent sure" that defendant was the shooter. The fact that defendant's statement to the ASA was videotaped allowed the jury to assess Jeremy's demeanor and compare it to how he behaved on the stand at trial. *Armstrong*, 2013 IL App (3d) 110388, ¶ 27. Again, it is within the province of the jury, as the trier of fact, to weigh the prior inconsistent statements, weigh Jeremy's testimony at trial, and determine which is to be believed. *Id.* The jury's verdict suggests that it credited Jeremy's prior inconsistent

statements where he identified defendant as the shooter and, for purposes of our review, there is no basis for this court to substitute its judgment for that of the jury where the verdict was based on properly admitted evidence. Accordingly, we find that the evidence presented in this case was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt.

¶ 36 Although our analysis on this issue could end here, we find it important to address the authority defendant cites in support of this contention. First, defendant relies on *People v. Reyes*, 265 Ill. App. 3d 985 (1993). In *Reyes*, defendant Andrew Reyes was charged with attempted murder and aggravated battery for his alleged participation in a group beating. *Id.* at 986. The State called two witnesses who were present for the altercation. *Id.* One of the witnesses, Patricia Mendoza, testified that she saw Reyes at the scene of the beating, but she did not remember whether he participated in the beating. *Id.* The other witness, Rita Mendez, offered similar testimony. *Id.* at 986-87. Both witnesses testified that they did not have a good view of the beating and therefore could not be sure of defendant's participation. *Id.* Mendoza acknowledged that when she testified before the grand jury, she affirmatively stated that she had witnessed Reyes beating the victim. *Id.* at 986. She testified at trial, however, that he grand jury testimony was a lie. *Id.* Mendez also acknowledged that she testified at the grand jury hearing that she saw defendant participating in the beating, but she testified at trial that she misunderstood the question at the grand jury proceeding. *Id.* at 987. Reyes testified on his own behalf that while he was present when the beating started, he quickly left the scene and did not participate in the beating. *Id.* 987-88.

¶ 37 The court found Reyes guilty of the charged offenses and Reyes appealed asserting that the State failed to prove him guilty beyond a reasonable doubt where the State's two witnesses recanted their implicating testimony at trial. *Id.* at 988. This court agreed with Reyes, finding that the "only evidence" to contradict Reyes' assertion that he did not participate in the group beating

was the grand jury testimony of Mendoza and Mendez. *Id.* at 989. The court found that the "credibility of this testimony is greatly reduced by the fact that both witnesses later disavowed their grand jury statements." *Id.* The court also noted that the grand jury statements were not "detailed accounts" of Reyes's participation in the beating, but were instead "one word responses to the prosecutor's leading question[s] ***." *Id.* The court further observed that Mendez asserted that the police coerced her into identifying the participants in the beating, and that this assertion was "uncontroverted" at trial. *Id.* Accordingly, the court held that the State had failed to prove Reyes guilty beyond a reasonable doubt. *Id.* at 990.

¶ 38 We find the circumstances in the case at bar are distinguishable from those present in *Reyes*. First, unlike the uncorroborated grand jury statements in *Reyes*, Jeremy's prior identifications of defendant are corroborated by the unequivocal and unrecanted testimony of Romell, who consistently identified defendant as the shooter. As noted, *supra*, defendant's attempts to cast doubt on Romell's identification testimony are unfounded. Furthermore, Jeremy's identification of defendant did not stem solely from his grand jury testimony. Rather, Jeremy consistently identified defendant as the shooter in a photograph array, in a lineup, and to an ASA in a videotaped statement. In addition, Jeremy's grand jury testimony in which he identified defendant as the shooter was not "one word responses to the prosecutor's leading question[s]." Instead, at the grand jury, the prosecutor asked Jeremy:

"Q. How close were you to Charinez and the shooter when you turned around and saw that?

A. I would say 15 feet.

Q. After he shot her, what happened?

A. He looked up and at me, and as he turned his head to look at me I looked at him and he took off right back. The same way he was coming he took off back.

Q. When he turned and looked up at you, were you able to see his face at that point?

A. Yes, ma'am.

*\*\**

Q. Did you recognize him?

A. Yes, ma'am.

Q. Who did you see shoot Charinez Jefferson?

A. Timothy Jones.

Q. Who is Timothy Jones[?]

A. A fellow rival gang member of mine."

Furthermore, when the State confronted Jeremy with this testimony, he did not testify that he lied at the grand jury proceeding or that he misunderstood the questions. Rather, he acknowledged that he gave that testimony.

¶ 39    Finally, although Jeremy did testify that he was coerced by police into identifying someone as the shooter, such evidence was not "uncontroverted" as it was in *Reyes*. Jeremy told the ASA who took his videotaped interview that he had not been coerced or threatened into making an identification, and further testified at the grand jury proceeding that he freely chose to give the statement to the ASA and that no one forced or threatened him to give the statement. Jeremy was also asked at the grand jury proceeding how the police treated on the day he made the recorded statement and Jeremy responded that he was "treated very fairly." In addition, Sergeant Foster testified that he did not threaten or coerce Jeremy into making an identification and that Jeremy

was articulate, cooperative, and very personable when he spoke to him at the police station. Accordingly, we find the circumstances of this case distinguishable from those in *Reyes*.

¶ 40    Defendant next relies on *People v. Parker*, 234 Ill. App. 3d 273 (1992). In *Parker*, the defendant, David Parker, was convicted of murder, armed violence, attempted murder, and aggravated battery. *Id.* at 273. The only evidence presented against Parker was the prior inconsistent statements of three State witnesses from three signed witness statements given to police. *Id.* at 273-74. One witness testified that he gave a statement inculpating Parker in the shooting while he was recovering from surgery and was still in the hospital. *Id.* at 275-76. The witness testified that he " 'did not want to be bothered' " and only signed the statement because he wanted to get the police detective out of his room. *Id.* at 276. The second witness denied knowing defendant or being at the scene. *Id.* at 277. He testified that he only signed the statement inculpating defendant in the shooting because police officers told him that he would be arrested for withholding information if he did not sign it. *Id.* The third witness testified that the statement given to police was falsified and that the police had beaten him and forced him to sign the statement. *Id.* at 278.

¶ 41    In reversing the trial court's judgment, this court found that the "only evidence that inculpated defendant was prior inconsistent statements which were directly contradicted by the alleged declarants at trial ***." *Id.* at 280. The court found that the lack of credible eyewitness testimony, combined with the lack of physical evidence linking defendant to the crime, was insufficient to sustain Parker's convictions. *Id.*

¶ 42    We find the circumstances of *Parker* distinguishable from the case at bar in several important respects. First, with regard to corroboration, Romell's testimony that defendant was the shooter sufficiently corroborated Jeremy's prior inconsistent statement to the same. Thus, the

State's case was not based solely on the prior inconsistent statements as it was in *Parker*. In addition, the three disavowed statements in *Parker* were each prepared by the police, not by the witnesses themselves. In this case, Jeremy's prior inconsistent statements were his own words from the videotaped statement with the ASA and his grand jury testimony. This court has recognized that *Parker* "in no way stands for the proposition that a recanted statement can never be sufficient evidence to support a defendant's conviction." *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 26. Rather, it merely finds that in the narrow circumstances present in that case, the credibility of the evidence was greatly reduced where the three witnesses directly contradicted their prior inconsistent statements. *Id.* Here we find that Jeremy's prior inconsistent statements, which were not impeached to the extent in *Parker*, combined with Romell's corroborating testimony, were sufficient to sustain defendant's convictions.

¶ 43 Finally, defendant relies on *People v. Brown*, 303 Ill. App. 3d 949 (1999). Similar, to *Parker*, in *Brown* this court found that the "only evidence" linking defendant to the crime was a disavowed witness statement. *Id.* at 965. The court also noted that the statement identifying the defendant as the shooter was not made until nearly two years after crime occurred. *Id.* The court concluded that "[d]ue to the *particular circumstances of this case*, where [the witness's] prior statements were not made contemporaneously with the victim's shooting and lacked corroborative evidence, we find that [the witness's] prior statements, alone, which were later disavowed, were insufficient to prove defendant guilty beyond a reasonable doubt." (Emphasis added.) *Id.*

¶ 44 In this case, as discussed, there is corroborative evidence for Jeremy's prior statements in the form of Romell's testimony identifying defendant as the shooter. In addition, Jeremy's statement to an ASA identifying defendant as the shooter and his identification of defendant in the photograph array and the lineup were made days after the shooting, not nearly two years later as

in *Brown*. Finally, as the court in *Brown* noted, its decision was based on the "particular circumstances" of that case. Because the case bar presents different circumstances, including corroborating testimony and prior statements with greater *indicia* of reliability, we find that a different result is warranted here. Accordingly, we find no basis to disturb the jury's verdict that the State proved defendant guilty of the charged offenses beyond a reasonable doubt.

¶ 45                                  B. Ineffective Assistance

¶ 46    Defendant next contends that the court erred in denying his motion for a new trial based on the ineffective assistance of his trial counsel. Defendant asserts that Urban and Massarello's testimony at the hearing showed that they failed to adequately investigate his alibi defense and thus the failure to present the defense could not be reasonable trial strategy. Defendant further contends that by denying his motion based on the credibility of the alibi witnesses, the trial court usurped the jury's role. Defendant maintains that it was the responsibility of the jury to weigh whether Ericka and Cynthia's testimony about defendants' alibi was credible and the proper question for the court was whether the evidence, if presented to the jury, would have changed the result on retrial.

¶ 47    Claims of ineffective assistance of counsel are reviewed pursuant to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prove ineffective assistance under that standard, defendant must show that his counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 38. In this case, the court held an extensive hearing on defendant's claim of ineffective assistance. Defendant's trial counsel and his associate testified at length regarding the witnesses they investigated and what those witnesses told them. Crucially, both Urban and Massarello testified that neither Ericka nor Cynthia, nor defendant, ever mentioned an alibi defense. Defendant asserts

that Massarello acknowledged that she never asked any of the witnesses if they had had an alibi defense, but Massarello testified that she would not ask witnesses if they had alibi evidence because witnesses would generally offer such information without being prompted. Defendant's assertion that neither Ericka nor Cythnia would offer crucial alibi evidence and that defendant would not alert his counsel to the possibility of the alibi evidence without specifically being asked about it defies logic.

¶ 48    As noted, the trial court specifically asked defendant during trial if there was additional evidence that he wished Urban to present.

> "THE COURT: Do you have any additional evidence that Mr. Urban has not offered that you wish to be offered?
>
> THE DEFENDANT: No.
>
> THE COURT: Obviously you're satisfied with Mr. Urban's work on this case; is that right?
>
> THE DEFENDANT: Yes."

There is thus no suggestion that defendant or any of the witnesses ever told Urban about the purported alibi as defendant indicated that he had no other evidence he wanted Urban to present despite the fact that Urban had not presented any evidence of an alibi. Accordingly, because there is no evidence that Urban was ever apprised of the purported alibi, he was not ineffective in failing to investigate and present the defense. *People v. English*, 403 Ill. App. 3d 121, 138 (2010).

¶ 49    Even if we found that trial counsel was aware of the alibi defense and rendered unreasonable assistance in failing to present it, we would nonetheless find that defendant failed to demonstrate that he was prejudiced by the deficient performance. The trial court found that Ericka and Cynthia's testimonies were "inconsistent" and "illogical" and it would have been a "fatal

error" for trial counsel to call them as witnesses. This conclusion is amply supported by the record. For instance, Ericka testified at the hearing that she knew defendant did not leave the house between August 16 when he returned home from the hospital and August 20 when he was arrested because she was there with him the whole time. She later testified, however, that she was not home when defendant was arrested because she was on the west side of Chicago. In addition, as the trial court recognized, Ericka testified inconsistently about where defendant stayed in the house when he returned home from the hospital, testifying at trial that he went into the basement to his bedroom, but testifying at the hearing on the motion for a new trial that he laid down on the couch on the main floor. The trial court also found that defendant himself "ramble[d] incoherently on the witness stand" and did not even know the names of the potential witnesses who were alleged to have been with him at his house. We thus cannot say that defendant was prejudiced by trial counsel's failure to present the purported alibi defense where the witnesses gave illogical, inconsistent, and incoherent testimony.

¶ 50     Defendant asserts, however, that the trial court erred in assessing the credibility of the witnesses at the hearing on the motion for the new trial because the jury was the finder of fact in this case and the credibility of the witnesses should have been left to the jury's determination. Defendant's contention on this matter simply finds no support in Illinois law. It is well-settled that, even in jury trials, the circuit court is the finder of fact on posttrial motions. See *People v. Evans*, 54 Ill. App. 3d 883, 886 (1977) (finding that where the question presented is one of credibility of witnesses who testified at hearing on posttrial motion following a jury trial, it is the function of trial court to determine witnesses' credibility); see also, *People v. Veal*, 58 Ill. App. 3d 938, 989 (1978) (finding that the trial court was in the best position to judge the credibility of the witnesses who testified at the posttrial hearing following a jury trial because the court could closely observe

the demeanor of the witness at the hearing on the motion and at trial). Under the procedure defendant proposes, the trial court would have to reconvene the jury to hear testimony from alibi witnesses any time a defendant presents witnesses at a posttrial hearing. This simply cannot be the standard. Accordingly, we find that the trial court properly assessed the credibility of the witnesses at the hearing on the motion for a new trial and did not err in denying defendant's motion for a new trial where counsel's performance was not deficient and did not prejudice the defense.

¶ 51                                    C. Defendant's Sentence

¶ 52                                    1. *Proportionate Penalties*

¶ 53    Defendant raises two distinct challenges to his sentence. He first contends that his sentence violates the Proportionate Penalties clause where he was only 18 years old at the time of the offense and was sentenced to a *de facto* life sentence. Defendant further asserts that recent developments in the law, combined with emerging science on brain development, have prompted Illinois courts to find that *de facto* life sentences for young adult offenders are unconstitutional. Defendant contends that we should therefore remand his cause for resentencing.

¶ 54                                    i. *Miller v. Alabama*

¶ 55    In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that mandatory life sentences for juveniles violate the eighth amendment's prohibition against cruel and unusual punishment. *Miller*, 567 U.S. at 489. *Miller* requires sentencing courts in homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. The Supreme Court expanded on its decision in *Miller* in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016). In *Montgomery*, the Court determined that *Miller* should apply retroactively and that state courts must apply *Miller* in collateral proceedings. *Id.* at ___, 136 S. Ct. at 732. The Court further found that *Miller* did not

prohibit all life sentences for juveniles, but reserved life sentences for "the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Throughout the decision, the court repeatedly stated that the decision in *Miller* applied only to juvenile offenders sentenced to "mandatory life without parole." *Id.* at ___, 136 S. Ct. at 726, 732, 733.

¶ 56    In *People v. Reyes*, 2016 IL 119271, our supreme court expanded the holding of *Miller*, finding that *Miller* applied to so-called "*de facto*" life sentences for juveniles. The supreme court found that such sentences violate *Miller* where the sentence is so long that it amounts to "a mandatory term of years that is the functional equivalent of life without the possibility of parole *** ." *Id.* ¶ 9. Recently, in *People v. Buffer*, 2019 IL 122327, ¶ 40, our supreme court determined that a prison term of 40 years or more is considered a *de facto* life sentence. Further, in *People v. Holman*, 2017 IL 120655, ¶ 40, the supreme court applied *Miller* to discretionary life sentences finding that "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." The *Holman* court held that "a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46.

¶ 57                                    ii. *Young Adults Under Miller*

¶ 58    Recently, there has been a trend in the appellate court wherein young adults seek to have their sentences invalidated on the basis of *Miller* principles. See, *e.g.*, *People v. White*, 2020 IL App (5th) 170345, *People v. Suggs*, 2020 IL App (2d) 170632, *People v. Handy*, 2019 IL App (1st) 170213, *People v. House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Ill. Jan.

29, 2020), *People v. LaPointe*, 2018 IL App (2d) 160903, *People v. Pittman*, 2018 IL App (1st) 152030. Defendants in these cases generally raise challenges to their sentences under the eighth amendment, as expressly provided in *Miller*, and under the proportionate penalties clause of the Illinois Constitution. Our supreme court has recognized, however, that eighth amendment "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *People v. Harris*, 2018 IL 121932, ¶ 61 (collecting authorities). However, whether a young adult defendant has a cognizable claim under the proportionate penalties clause is less clear. Similar to the eighth amendment, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I. § 11. A challenge under the proportionate penalties clause "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Some decisions of this court have suggested that the proportionate penalties clause may provide greater *Miller*-based protections for young adult offenders than those afforded by the eighth amendment. See *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 51-53, (noting inconsistency about whether the eighth amendment and proportionate penalties clause are co-extensive and should be interpreted in "lockstep"); see also, *House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020) (finding a young adult's mandatory life sentence violated the proportionate penalties clause). Defendants in such cases argue, as defendant here, that there is little distinction between juvenile offenders just under the age of 18 and offenders who are barely older. The defendants also cite to emerging science regarding brain development suggesting that brain development does not stop in young adults until their mid-20s.

¶ 59    The supreme court opened the door for such arguments in *People v. Thompson*, 2015 IL 118151. In *Thompson*, the 19-year-old defendant shot and killed his father and a woman who was inside his father's house. *Id.* ¶ 4. After the court found the defendant guilty of two counts of first degree murder, he was sentenced to a term of natural life imprisonment. *Id.* ¶ 7. This court affirmed the defendant's conviction and sentence on direct appeal. *Id.* ¶ 8. The defendant filed several postconviction pleadings, including a petition pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)) that was the subject of the supreme court's ruling. *Id.* ¶¶ 9-14. In that petition, the defendant raised due process violations and claims of ineffective assistance of counsel. *Id.* ¶ 14. On appeal, however, the defendant abandoned those claims and instead asserted that his mandatory life sentence was unconstitutional pursuant to *Miller* under both the eighth amendment and the proportionate penalties clause. *Id.* ¶¶ 16-17. This court rejected defendant's contentions, finding that his as-applied constitutional challenge was not properly before the court because it was raised for the first time on appeal. *Id.* ¶ 18.

¶ 60    The supreme court granted the defendant leave to appeal and agreed with the appellate court's conclusion that defendant forfeited his as-applied challenge to his sentence under *Miller* by raising it for the first time on appeal. *Id.* ¶ 39. The court noted that the defendant relied on the "evolving science" of juvenile maturity and brain development, but the defendant failed to establish how this "evolving science" applied to the circumstances of his case. *Id.* ¶ 38. The court noted that the circuit court was the appropriate tribunal for developing the factual record to adequately address defendant's claim. *Id.* The court stated, however, that the defendant was "not necessarily foreclosed" from raising his constitutional challenge in the circuit court and noted that the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) was "expressly designed

to resolve constitutional issues." *Id.* ¶ 44. The court concluded that "we express no opinion on the merits of any future claim raised by defendant in a new proceeding." *Id.* ¶ 44.

¶ 61　　The supreme court again addressed a young adult offender's claim pursuant to *Miller* in *Harri*s, 2018 IL 121932. In *Harris*, the 18-year-old defendant received a 76-year sentence for first degree murder and aggravated battery with a firearm. *Id.* ¶ 1. The defendant contended, for the first time in his direct appeal, that his sentence violated the proportionate penalties clause. *Id.* ¶ 17. This court vacated defendant's sentence finding that '[w]hile we do not minimize the seriousness of [defendant's] crimes, we believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society.' " *Id.* ¶ 18 (quoting *People v. Harris*, 2016 IL App (1st) 141744, ¶ 69, *aff'd in part, rev'd in part*, *Harris*, 2018 IL 121932). On appeal, the supreme court noted that the defendant was raising an as-applied challenge to his sentence. *Harris*, 2018 IL 121932, ¶ 37. The court stated that it was therefore "paramount" that the record be sufficiently developed in terms of the defendant's specific facts and circumstances. (Internal quotation marks omitted). *Id.* ¶ 39. The court noted that the defendant did not raise his as-applied challenge in the trial court and thus the trial court did not hold an evidentiary hearing where it could make findings of fact regarding the defendant's specific circumstances. *Id.* ¶ 40.

¶ 62　　The court found that because the defendant was 18 years old at the time of the offense, *Miller* did not apply directly to his circumstances. *Id.* ¶ 45. As in *Thompson*, the supreme court determined that the record was not sufficiently developed to address the defendant's claim that *Miller* applied to his particular circumstances. *Id.* ¶ 46. Despite the defendant's arguments to the contrary, the supreme court found that the record was not sufficiently developed to address his as-applied challenge because the record contained "only basic information about defendant, primarily

from the presentence investigation report." *Id.* The court noted that an evidentiary hearing was not held and the trial court did not make any findings of fact on the "critical facts" needed to determine whether *Miller* applied to the defendant as an adult. *Id.* The court concluded that the defendant's as-applied challenge was premature because the record did not contain evidence about how the evolving science on juvenile maturity and brain development that the Supreme Court cited in *Miller* applied to the defendant's specific facts and circumstances. *Id.* The court noted, however, as it did in *Thompson*, that the defendant was "not necessarily foreclosed" from raising an as-applied challenge in another proceeding, such as in a petition under the Act. *Id.* ¶ 48.

¶ 63    Defendant here, like the defendants in *Thompson* and *Harris*, raises an as-applied challenge to his sentence. He maintains that he was only 18 years old at the time of the offense, had a learning disability, and cites to studies evaluating brain development in young adults. However, these factors concern only "basic information" about defendant and do not address how evolving brain science and other *Miller* factors apply to this specific defendant. As in *Harris* and *Thompson*, there was no evidentiary hearing held in the trial court so that the court could make findings of fact on the "critical facts" needed to determine whether *Miller* applies to this defendant as an adult. Rather, the record contains "only basic information about defendant, primarily from the presentence investigation report." *Id.* ¶ 46. As the supreme court noted in *Harris*,

> "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review. [Citation.] We have reiterated that a court is not capable of making an as-applied determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary

record, any finding that a statute is unconstitutional as applied is premature." (Internal quotation marks omitted.) *Harris*, 2018 IL 121932, ¶ 39.

As such, the record is not sufficiently developed for us to consider defendant's as-applied challenge on appeal. As in *Thompson* and *Harris*, the record is simply insufficient to address defendant's premature as-applied constitutional challenge to his sentence. See *Figueroa*, 2020 IL App (2d) 160650, ¶ 89 (citing *People v. Vega*, 2018 IL App (1st) 160619, ¶ 57).

¶ 64                                    2. *Excessive Sentence*

¶ 65    Finally, defendant contends that his sentence is excessive in light of his youth and its attendant characteristics and his potential for rehabilitation. Defendant acknowledges that he failed to challenge his sentence in the trial court, but asserts that counsel's failure to challenge the excessiveness of his sentence represents ineffective assistance and the trial court's failure to consider his youth is plain error. Defendant asserts that this court should therefore remand his cause for resentencing.

¶ 66                                    i. Plain Error

¶ 67    The plain error rule allows a reviewing court to consider unpreserved claims of error regardless of forfeiture. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Plain error applies when there is a clear or obvious error and the evidence is so closely balanced that the error would change the outcome of the case or when there is a clear or obvious error that is so serious that it affected the fairness of defendant's trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first consideration in addressing defendant's plain error argument is determining whether an error occurred, which requires a " ' "substantive look" ' " at the issue. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008).

¶ 68                                    1. *Standard of Review*

¶ 69     A reviewing court will not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion in determining a sentence where the sentence is greatly at variance with the spirit and purpose of the law or if it is manifestly disproportionate to the nature of the offense. *Id.* The trial court is afforded such deference because it is in a better position than the reviewing court to weigh the relevant sentencing factors such as " 'defendant's credibility, demeanor, general moral character, mentality, social environment, and age.' " *People v. Stevens*, 324 Ill. App. 3d 1084, 1093-94 (2001) (quoting *People v. Streit*, 142 Ill. 2d 13, 19 (1991)). In the absence of evidence to the contrary, we presume that the sentencing court considered all mitigating evidence presented. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51 (citing *People v. Burton*, 184 Ill. 2d 1, 34 (1998)).

¶ 70                              2. *Defendant's Sentence*

¶ 71     Here, defendant was found guilty of first degree murder (720 ILCS 5/9-1(A)(1) (West 2016)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)). Defendant was thus eligible for a term of imprisonment between 20 and 60 years (730 ILCS 5/5-4.5-20(a)(1) (West 2016)) on the first degree murder count and a term of 4 to 15 years on the aggravated discharge of a firearm count (730 ILCS 5/5-4.5-30(a) (West 2016)). Because defendant personally discharged a firearm the proximately caused death, the court was required to add a 25-year firearm enhancement to his sentence. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016). The court sentenced defendant to 55 years' imprisonment on the first degree murder charge, with a mandatory, consecutive 25-year term for the firearm enhancement, and a consecutive 10-year term for aggravated discharge of a firearm, for a total cumulative sentence on 90 years' imprisonment. Defendant's sentence therefore fell within the prescribed statutory range, and, accordingly, we

grant great deference to the trial court's determination of that sentence. *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 40.

¶ 72   Defendant nonetheless contends that the trial court did not adequately consider the mitigating factors presented and that he was entitled to a lower sentence. The record shows, however, that during the sentencing hearing, defense counsel identified the same mitigating factors defendant brings to our attention on appeal, including defendant's youth, learning disability, and rehabilitative potential. It is not our function to independently reweigh these factors and substitute our judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 214-15. Although the trial court did not specifically identify which factors it considered in determining defendant's sentence, we observe that a trial court is not required to specify on the record the reasons for the sentence imposed (*People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 22) nor is it required to recite and assign value to each factor presented at the sentencing hearing (*People v. Baker*, 241 Ill. App. 3d 495, 499 (1993)). Rather, it is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it, and the burden is on defendant to affirmatively show the contrary. *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010). Defendant here has failed to do so.

¶ 73   Further, although defendant presented mitigating factors, we note that the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 (citing *Alexander*, 239 Ill. 2d at 214). Here, there can be no question that the seriousness of the offense weighed heavily in the trial court's sentencing decision. The record shows that defendant stood over Charinez and shot her at while Charinez begged defendant to not shoot her because she was pregnant. The postmortem examination, which was entered into evidence by stipulation, stated that Charinez had eight bullet

wounds. An evidence technician testified that she recovered seven expended shells and one fired bullet from the scene. The evidence presented at trial suggested that defendant shooting at Jeremy was gang-related retaliation for defendant's own shooting earlier that day, but defendant likely knew that Charinez, a pregnant woman, was not a rival gang member and was not a threat to him. He nonetheless shot her repeatedly from point blank range while calling her a "b****." The State presented evidence that Charinez's baby survived the shooting, but suffered innumerable health complications, was entirely reliant on others to survive, and had a poor prognosis. The court found that defendant's actions were "horrific" and showed a "complete disregard for human life." This court has recognized that " 'the seriousness of the offense is considered the most important factor in determining a sentence.' " *People v. Murray*, 2020 IL App (3d) 180759, ¶ 30 (quoting *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53). Thus, the court properly imposed a 90-year sentence based on the seriousness of defendant's offense.

¶ 74  Defendant also points out that the court expressly stated that it had to consider defendant's potential for rehabilitation, but nonetheless sentenced him to a *de facto* life sentence, depriving him of any opportunity to be rehabilitated. We observe, however, that the rehabilitative potential of a defendant is only one of the factors that the trial court needs to weigh in deciding a sentence and does not outweigh any other factor. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). The trial court also considered defendant's criminal record, which included crimes he committed as a juvenile. In 2008, defendant was adjudicated delinquent for possession of a stolen motor vehicle and unlawful possession of a weapon. In 2009, he was adjudicated delinquent again for burglary. Further, at the sentencing hearing, the State presented witnesses who related to the court that they had been victims of armed robberies perpetrated by defendant just one month before the shooting

in this case.[1] Defendant was also on probation at the time of this shooting and at the time of the two separate armed robbery offenses. The court was at liberty to consider the evidence presented of the armed robberies (See *People v. Lusby*, 2020 IL 124046, ¶¶ 47-48) and the fact that defendant was on probation (*People v. Risley*, 359 Ill. App. 3d 318, 920 (2005)) in assessing defendant's rehabilitative potential.

¶ 75    Finally, defendant contends that the court failed to adequately consider his youth in determining his sentence. Defendant points out that in announcing his sentence, the court did not even mention his age at the time of the offense. We observe, however, that defendant's age was noted in the PSI report and defense counsel noted defendant's age at the time of sentencing in arguing in mitigation. The court presided over the entire proceeding and was familiar with defendant having placed him on probation prior to the incident in question. The supreme court has found that where defendant's age at the time of the offense is sufficiently before the court, such as in the PSI report and in the parties' arguments, we can presume that the trial court considered defendant's youth and its attendant characteristics in determining his sentence. See *Lusby*, 2020 IL 124046, ¶¶ 38-39, 52. Accordingly, we find no abuse of discretion where the sentence imposed was within the prescribed statutory range, does not greatly vary from the purpose of the law, and is not manifestly disproportionate to the nature of the offense. *Brazziel*, 406 Ill. App. 3d at 433-34 (citing *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Because we find no abuse of discretion by the trial court, we therefore find no plain error. *See People v. Coats*, 2018 IL 121926, ¶ 32 (absent an error, there can be no plain error). Because there was no plain error, we need not address defendant's alternative argument that his counsel was ineffective in failing to challenge his

---

[1]The two armed robbery cases were pending before the same trial court judge as the case at bar. Following the court's entry of the sentence in this case, the State moved to *nolle prose* the charges in those cases.

sentence. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 (where there is no plain error, there can be no ineffective assistance of counsel).

¶ 76                                    III. CONCLUSION

¶ 77    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 78    Affirmed.