# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Armstrong, 2013 IL App (3d) 110388**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER ARMSTRONG, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0388 |
| Filed | April 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The evidence was sufficient to sustain defendant's conviction for first degree murder arising from a drug deal gone awry, notwithstanding defendant's contentions that no physical evidence linked defendant to the crime and the State's case rested solely on a prior inconsistent statement of a witness who recanted, since a conviction can be based on a recanted statement, there was some corroborative evidence, and the trier of fact's determination of credibility was entirely within its purview. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 09-CF-1334; the Hon. Glenn H. Collier, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Jay Wiegman (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

Jerry Brady, State's Attorney, of Peoria (Terry A. Mertel and Robert M. Hansen (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.

Presiding Justice Wright and Justice McDade concurred in the judgment and opinion.

## OPINION

¶ 1 Following a trial in the circuit court of Peoria County, a jury found defendant, Christopher Armstrong, guilty of first degree murder. The trial court sentenced defendant to 65 years in the Illinois Department of Corrections.

¶ 2 Defendant appeals from his conviction, claiming that the State failed to prove him guilty beyond a reasonable doubt where no witness at trial was able to identify defendant as the shooter and there was a lack of physical evidence linking defendant to the victim. We affirm.

¶ 3 BACKGROUND

¶ 4 Evidence presented at trial paints the picture of a drug transaction gone awry. On the evening of June 29, 2009, the victim, Jonathan Pickett, contacted James Pomerlee in an attempt to purchase marijuana. Pickett had bought marijuana from Pomerlee on previous occasions. Pickett told Pomerlee he was making this particular purchase on someone else's behalf. Pomerlee indicated to Pickett that he could get him the marijuana, and told Pickett to meet him at a gas station on the south end of Peoria. Pomerlee then asked Michael Linwood to give him a ride to the gas station. Linwood's girlfriend, Joanna Williams, drove both Pomerlee and Linwood to the gas station to meet Pickett. Pomerlee testified at trial that he sat in the backseat behind the driver.

¶ 5 Pickett arrived at the gas station shortly after Pomerlee, Linwood and Williams arrived. Pomerlee testified that Pickett was in a white sedan and was on the phone with the person for whom he was buying the marijuana. Pomerlee testified that he does not know who Pickett was on the phone with at the time, but the unidentified person told Pickett to meet him on Greenlawn Street. Pickett then told Pomerlee to follow him. Pickett was in his own vehicle; Pomerlee followed in Williams' vehicle (again, Williams was driving and Pomerlee was in the backseat behind the driver). At this point, Pickett parked his vehicle in front of a house

five or six houses down from the gas station on Greenlawn Street. Pomerlee testified that Pickett was talking to someone on the porch of this home. Pickett then approached the house, asked a question, and turned and walked back down the steps. Testimony elicited earlier in the trial revealed that Pickett was speaking with two Iraqi refugees who were fixing a broken door on the home and that he asked the two men where "Lacy" was. Pomerlee stated that Pickett was talking into his cell phone as he walked away from the house. Pickett then came back to the vehicle Pomerlee was in and told Pomerlee to move down the street.

¶ 6    The respective vehicles moved approximately two houses down on Greenlawn Street. Pickett exited his car and approached a different house, where he spoke to a person sitting on the porch and shook the person's hand. Pickett turned around and returned to his vehicle by himself. Pomerlee testified they waited for approximately 10 to 20 minutes and, during that time, he could see Pickett calling someone on the phone. At that point, Pomerlee testified that Linwood noticed a black male come from between two houses on the opposite side of the street and approach Pickett's vehicle. Pomerlee stated that he could see the man had a handgun, and that he approached Pickett's car and told him to hand over the marijuana. The man made Pickett get out of his car; Pickett's hands were in the air. Pomerlee stated he could hear Pickett say, "I don't have nothing, I don't have nothing," then say "they got it" as he pointed to Williams' vehicle. At Pomerlee and Linwood's urging, Williams immediately put the car in reverse and drove down the street backwards. Pomerlee saw the man and Pickett "tussling," then heard a gunshot. Pickett's assailant started to run toward the house where someone had been on the porch, then he turned around and shot Pickett again as Pickett was attempting to get to his feet. As Williams, Linwood and Pomerlee left the scene, Pomerlee tried calling Pickett on his cell phone, but got no answer. Pickett later died of multiple gunshot wounds.

¶ 7    Pomerlee stated that the police came to his home in the early morning hours of June 30, approximately around 5 a.m., and he accompanied them down to the station to talk. The police showed him two different photo lineups, out of which he was able to identify the man on the porch across from where Pickett was shot as Jacorey Shettleworth. Pomerlee was not able to identify defendant as the shooter, even though his picture was in the photo array. On cross-examination, Pomerlee had difficulty recalling some of the events of that night. He further testified that the shooter was wearing blue shorts, a white shirt and some kind of hoodie that covered his face.

¶ 8    Joanna Williams was also a witness for the prosecution and testified about the events leading up to Pickett's death. According to Williams, Pickett's assailant was wearing black clothing and approached Pickett's vehicle from a blue abandoned house on the left hand side of the street. She further testified that Pomerlee and Linwood yelled at her to back up and, as she was doing so, she saw Pickett and the other man wrestling. Williams then heard at least three gunshots. Williams testified that she was never able to get a look at the man's face or see who he was. Finally, Williams stated that Pomerlee was seated in the backseat behind the passenger's seat, not the driver's seat.

¶ 9    Linwood first testified that he rode down to the gas station with Pomerlee and his then-girlfriend, Williams, so that Pomerlee could meet someone, but Linwood did not know who it was that Pomerlee intended to meet. Linwood stated that it was Pomerlee, and only

Pomerlee, that went around the corner to the 700 block of Greenlawn. According to Linwood, he and Williams drove around the block a couple times–"Between Ann and Blaine, you know, to Garden to Western to Ann, you know. *** That's the way." Linwood stated that Pomerlee was on Greenlawn, and after awhile he came back by and they (Williams and Linwood) picked him up. When asked if something happened between the time Pomerlee left and ultimately returned, Linwood responded that something had happened, but that he did not see what happened. He stated that he heard some gunshots, but he did not know who shot the gun. Linwood stated he was never on Greenlawn the night of the incident, but rather that he "was around the vicinity of Greenlawn." He testified that when he gave Detective McDaniel the defendant's name as the shooter, it was just because he had heard defendant's name thrown around the neighborhood about who the shooter might have been. He testified that he told the detective that if the detective would show him a picture of the person, he could probably identify him. He stated that he was not sure, and that he only told the officer who he thought the shooter might have been.

¶ 10        The prosecution then impeached Linwood's trial testimony with a transcript of the videotaped interview conducted by Detective McDaniel the day after the shooting. When asked if he told the police that he was on Greenlawn that night, Linwood responded, "yeah." The prosecution then asked if he was on the street, and Linwood answered in the negative. Later, Linwood admitted that he "saw the scuffling and all that," but he could not "identify nobody face from some five cars down." Linwood acknowledged that while at the station for questioning, he was shown two different photo arrays. Linwood admitted that he picked defendant out of the photo lineup and initialed the lineup afterwards. Despite the identification Linwood made at the station, he continued to state at trial that he did not know who the shooter was and that he only had heard–from word of mouth–who the shooter was. Linwood repeatedly stated at trial that it was not based on anything he saw, but rather what he heard, and he did not want to "convict nobody" based on something he did not see.

¶ 11        Jacorey Shettleworth, who at the time of trial was incarcerated in the Illinois Department of Corrections, testified that he knew defendant. Shettleworth had at one time been a suspect in Pickett's shooting, but was released from custody without ever being charged. He testified that defendant was sometimes referred to as "Mo Chris" or "Stone Chris." The bulk of Shettleworth's testimony revolved around the phone number 309-635-2310 found in his call list after his phone was searched. When Shettleworth was initially questioned the day after the shooting, he told detectives during his videotaped interview that the number belonged to the defendant. Specifically, he stated that it belonged to "Chris...dude you all talking about." At trial, however, Shettleworth stated that he did not remember talking to the officers that day because he was intoxicated. Shettleworth admitted to making a videotaped statement, but testified that he did not remember saying to the detective that the number 309-635-2310 belonged to defendant. Shettleworth testified he told the detectives that he did not know whose number it was, and it was the detectives who told him it was the defendant's phone number. Shettleworth testified that he did not call defendant, but that someone must have used his phone to make those calls.

¶ 12        Detective Keith McDaniel testified that he met with James Pomerlee, Michael Linwood, and Jacorey Shettleworth following the shooting. Both Pomerlee and Linwood identified

Shettleworth as the man on the porch who spoke to Pickett before he was shot.

¶ 13      Portions of Detective McDaniel's interview with Linwood and Shettleworth were videotaped and played to the jury at trial. On a digital video disc (DVD), Linwood tells the officer that he was on Greenlawn Street in a car right behind Pickett's, and that he saw Pickett get shot "with my eyes," and that he could "see real good." Linwood then identified defendant as the shooter and Jacorey Shettleworth as the person on the porch that spoke to Pickett before he was shot. When Linwood picked defendant out of the photo lineup he stated, "that was Mo Chris, the guy who shot [Pickett]." Linwood continued to state that defendant did not have braids now.

¶ 14      Call records for Pickett's phone and Shettleworth's phone were both admitted into evidence. The records showed that Pickett made and received a total of 12 telephone calls between 9:55 p.m. and 10:45 p.m. from 309-635-2310, the number that Shettleworth identified as defendant's phone number. Shettleworth's call record showed that he received four telephone calls from that same number between 8:19 p.m. and 9:47 p.m. the day of the shooting.

¶ 15      The defendant did not testify and called Detective McDaniel as his only witness. McDaniel's testimony established that a neighborhood canvas after the shooting revealed no other witnesses or information about the crime. McDaniel stated that defendant was arrested approximately six months after the shooting.

¶ 16      Following closing arguments, the jury found defendant guilty of first degree murder. Defendant filed a posttrial motion raising the issue of reasonable doubt. The trial court denied that motion and imposed a 65-year sentence, which included the 25-year add-on for personal discharge of a firearm. Defendant filed a motion to reconsider sentence, which was also denied. This timely appeal followed.

¶ 17                           ANALYSIS

¶ 18      Defendant raises a single issue on appeal, namely, that the State failed to prove his guilt beyond a reasonable doubt where his conviction rested solely on the prior inconsistent statement of a witness who recanted at trial and where there was no physical evidence to link defendant to the shooting.

¶ 19      A criminal conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). When reviewing the sufficiency of the evidence to sustain a verdict on appeal, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Pollock*, 202 Ill. 2d 189, 217 (2002); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard of review applies to both direct and circumstantial evidence. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007).

¶ 20      In support of his contention, defendant argues that none of the three eyewitnesses to the murder could identify defendant as the shooter. Thus, the State's only evidence even circumstantially linking defendant to the shooting was the prior inconsistent statements

Linwood and Shettleworth made to police immediately following the incident. According to defendant, the prior inconsistent statements, without other corroborating evidence linking him to the shooting, are insufficient to prove his guilt beyond a reasonable doubt.

¶ 21 Pursuant to statute, Linwood's and Shettleworth's pretrial statements to Detective McDaniels implicating defendant constitute substantive evidence. 725 ILCS 5/115-10.1 (West 2010). Defendant does not dispute that these prior inconsistent statements were properly admitted. Instead, defendant claims that these previous statements were insufficient to convict him absent some corroborating evidence.

¶ 22 First, we find that there was some corroborative evidence to support defendant's conviction. Specifically, that Pickett and defendant were in frequent phone contact in the hour leading up to the shooting. The murder occurred at approximately 10:45 p.m.; between 9:55 p.m. and 10:45 p.m., there were approximately 12 to 13 calls between Pickett's number and the number identified by Jacorey Shettleworth as belonging to defendant. Moreover, the number originally identified as defendant's was also on Shettleworth's contact list four times about an hour prior to the shooting. Despite Shettleworth's recanted testimony, the fact that the number was also in Shettleworth's phone lends credibility to his statement that he knew the number and that it belonged to defendant. It also lends some support to the idea that it was defendant who lured Pickett to the location under the guise of buying drugs.

¶ 23 Even if there existed no corroborative evidence, a recanted prior inconsistent statement admitted under section 115-10.1 can support a conviction. *People v. Craig*, 334 Ill. App. 3d 426 (2002); *People v. Morrow*, 303 Ill. App. 3d 671 (1999). In *Morrow*, this court held that the witness's previous inconsistent statements alone were sufficient to prove defendant's guilt beyond a reasonable doubt. *Id.* at 677. There, the witness in question was Morrow's girlfriend. Her statements to police and her grand jury testimony were essentially the same, specifically that the victim paid the witness and another codefendant for sex. While the three were in the victim's car, the codefendant attempted to steal the victim's wallet. The victim realized what codefendant was doing, and a struggle ensued. Both the witness and the codefendant exited the victim's car and ran to the defendant's car, which was parked behind the victim's car. The defendant went to the victim's car, and the witness testified that she saw defendant shoot the victim. *Id.* at 674-75.

¶ 24 At trial, however, the witness denied knowing the victim and also denied being with him on the night of the murder. *Id.* This court found that while corroborative evidence did exist in the case, even had it not, the witness's prior inconsistent statements alone were enough to uphold defendant's conviction. *Id.* at 677. If a prior statement meets section 115-10.1's test, a "finding of reliability and voluntariness is automatically made. *** Accordingly, no additional analysis is needed. *** [I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony." (Internal quotation marks omitted.) *Id.* (quoting *People v. Pursley*, 284 Ill. App. 3d 597, 609 (1996)); see also *People v. Curtis*, 296 Ill. App. 3d 991 (1998).

¶ 25 It was similarly held in *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 23, that a conviction which is supported by a substantively admitted prior inconsistent statement may be upheld despite the witness recanting it on the stand. The trier of fact is free to accord any

weight to such properly admitted statement based on the same factors it considers in assessing direct testimony. *Id.* The *McCarter* court went on to state that there are no " 'suspect categories' " of properly admitted evidence that require a different standard of appellate review. (Internal quotation marks omitted.) *Id.* (quoting *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002)). Therefore, all properly admitted evidence, including prior inconsistent statements, is afforded the same weight by the reviewing court.

¶ 26    It is also clearly within the province of the trier of fact to assess the credibility of witnesses, weigh evidence presented, resolve conflicts in evidence, and draw reasonable inferences from the evidence, and its determination is entitled to great deference. *People v. Moss*, 205 Ill. 2d 139, 164-65 (2001); see also *People v. Jackson*, 232 Ill. 2d 246 (2009). Indeed, once a jury returns a guilty verdict based on a prior inconsistent statement, the reviewing court not only is under no obligation to determine whether the declarant's testimony was "substantially corroborated" or "clear and convincing," but it may not engage in that analysis. (Internal quotations marks omitted.) *Morrow*, 303 Ill. App. 3d at 677 (quoting *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998)).

¶ 27    In light of the foregoing, we find the evidence in this case was sufficient to prove defendant guilty beyond a reasonable doubt. The jury chose to believe the State's evidence, which included the prior inconsistent statements of Linwood and Shettleworth. This credibility determination was completely within its purview to make. The day after the shooting, Linwood told detectives that he recognized defendant's face, that he could see "real good," and that he saw what happened with his own eyes. He went on to pick defendant out of a photo lineup. Lending credibility to Linwood's videotaped statements was the fact that he knew defendant. Linwood was able to tell Detective McDaniels that defendant no longer had braids in his hair. The fact that the statement was videotaped allowed the jury to see Linwood's demeanor and compare it to that he exhibited on the stand at trial. Again, it is for the trier of fact to weigh the statement, weigh the disavowal and determine which is to be believed. See *People v. McBounds*, 182 Ill. App. 3d 1002 (1989).

¶ 28    Additionally, we note that Linwood's trial testimony was refuted by the testimony of Pomerlee and Williams. Both testified to being in the car behind Pickett's on Greenlawn Street and that Linwood was in the front seat. Their testimony clearly placed Linwood on Greenlawn on the night of the incident.

¶ 29    Our analysis could end at this point, but we find it important to address those cases cited by defendant in support of his contention. Defendant points the court to *People v. Parker*, 234 Ill. App. 3d 273 (1992), and *People v. Arcos*, 282 Ill. App. 3d 870 (1996), where both defendants' convictions were overturned on insufficiency of the evidence grounds when a witness's prior inconsistent statement was the only evidence linking the defendants to the respective crimes. We find defendant's reliance on these cases misplaced.

¶ 30    More recently in *People v. Craig*, 334 Ill. App. 3d 426, 440 (2002), this court distinguished *Parker* and *Arcos*:

    "Ultimately, in deciding whether there was sufficient evidence to prove defendant guilty beyond a reasonable doubt, we must decide whether cases such as *Arcos* and *Parker* require that convictions based solely upon prior inconsistent statements must also

have corroborating evidence to support the conviction. *** [U]nder *Morrow* and *Curtis*, additional corroboration is not required and we are not to engage in looking for corroboration. In light of the fact that *Morrow* follows the guidance from the supreme court in *People v. Wilson*, 66 Ill. 2d 346, 349 (1977) ('whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court'), and that the supreme court denied the appeals [in *Curtis* and *Morrow*] [citations], we follow that analysis." *Id.* at 440.

¶ 31     We, too, adopt the *Craig* analysis. As such, we find that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶ 32                                        CONCLUSION
¶ 33     For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed.

¶ 34     Affirmed.