2024 IL App (1st) 230114-U

SIXTH DIVISION
December 20, 2024

No. 1-23-0114

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 19834 |
| | ) | |
| DENZEL LEWIS, | ) | The Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The judgment of the circuit court is affirmed. The evidence presented by the State was sufficient to uphold the jury's verdict, the defendant was not prejudiced by the trial court's decision to bar his expert witness from testifying remotely, and the sentence imposed by the trial court was not excessive.

¶ 2                                    I. BACKGROUND

¶ 3   After a jury trial, Denzel Lewis was convicted of first degree murder and sentenced to 37 years' imprisonment. On appeal, he argues that the State's case, which was based primarily on the testimony of two eyewitnesses, was insufficient to prove him guilty beyond a reasonable doubt. In addition, he argues that he was prejudiced by the trial court's decision to bar his expert witness

from testifying remotely, and that the sentence imposed by the trial court was excessive. We affirm Lewis's conviction and sentence.

¶ 4    Lewis was charged with multiple counts of first degree murder, two counts of attempted murder, and one count of aggravated discharge of a firearm based on a shooting that took the place just after midnight on July 18, 2014, which resulted in the death of 16-year-old Kajuance Morton (Kajuance). On the night of the shooting, Kajuance was with his 14-year-old cousin, Kmari Mangum (Kmari), at Alice's Bar-B-Q (Alice's) in Chicago. They were waiting for their food when the shooter entered the restaurant, fired a bullet directly at Kajuance, and fled. After the shooting, police spoke with several witnesses, who described the shooter as a black male, "16 to 18 years of age." The witnesses also said the shooter was with another young man and that both were wearing gray hoodies; one had light-colored pants and the other had dark-colored pants. Video surveillance footage from Alice's, which was admitted into evidence, shows the shooter enter the restaurant, shoot directly at Kajuance, and then run out.

¶ 5    Kajuance was taken to the hospital on the night of the shooting, but he died from his injuries the next day. His mother, Trina Morton, contacted the Chicago police after her son's death, and spoke with Detective Carol Maresso. She supplied Detective Maresso with "a nickname of D-Mac and an actual name of Denzel Lewis as being the shooter that shot her son." Detective Maresso researched both the nickname and the actual name Denzel Lewis and found a photograph of someone with physical characteristics matching the description given by witnesses. She then generated a photo array that included Lewis's photo.

¶ 6    On July 29, 2014, Detective Maresso contacted Ezzard Dennis (Dennis), one of the customers present at Alice's during the shooting. Dennis said he believed he could identify the

shooter. On July 31, 2014, he viewed the photo array generated by Detective Maresso and identified Lewis as the shooter.

¶ 7     On September 29, 2014, Kajauance's cousin Kmari went to the police station with his stepfather and spoke with Detective Maresso. Maresso asked Kmari if he knew who was responsible for Kajauance's death, and he told her it was a guy named Denzel Lewis who went by the nickname D-Mac. Kmari saw Lewis enter Alice's, pull out a silver-colored handgun from his gray sweatshirt, and shoot Kajuance one time. Lewis attempted to fire again but the handgun jammed. After this interview, Maresso showed Kmari a photo array, and he identified Lewis as the shooter in "[m]aybe a minute."

¶ 8     On October 6, 2014, Kmari gave a videotaped statement to Assistant State's Attorney (ASA) Thor Martin. He told Martin that a little after midnight on July 18, 2014, he went with his cousin, Kajuance, to Alice's because they were bored and wanted food. After Kajuance ordered food, Kmari saw two boys coming out of the alley just west of the restaurant. He could see them through the open door and through the huge front window of the restaurant. The boys walked eastbound past the restaurant window but then "took a peep back." One of the boys then turned around, came back into the store, pulled out a silver gun, and fired at Kajuance. The gun jammed the first two times but went off the third time. The boy then ran out and back down the alley with the other boy. Both boys were wearing grey hoodies. Kmari saw the shooter's face and identified him as D-Mac. He recognized the shooter because they had ridden in a van together several months prior and spent about ten minutes talking. Kmari learned the shooter's nickname was D-Mac from his cousin, Kajuance, who showed him pictures of D-Mac on Twitter a month or two before the shooting. Kmari was "certain" that D-mac was the shooter because he "remembered his face." Kmari went to the hospital after the shooting and spoke with the police, but he did not tell them he

recognized the shooter at that time because he was "kind of nervous to get into it" and was "thinking something [was] gonna happen to [him]" if he talked. After Kajuance died the next day, however, Kmari told Kajuance's mother and her boyfriend that D-Mac shot Kajuance. Kmari said he voluntarily came to speak with ASA Martin to "tell what happened" and "tell the truth," that nobody told him to say anything, and that no one promised him anything in exchange for his statement.

¶ 9    Lewis was arrested on October 9, 2014, and was placed in a live lineup, which was separately viewed by Dennis and Kmari. After signing photo/lineup advisory forms, which informed them that "the suspect may or may not be in the lineup/photospread" and that they were "not required to make an identification," both Dennis and Kmari identified Lewis as the shooter a second time.

¶ 10    October 27, 2014, Kmari testified under oath before a grand jury. He said he was at Alice's on July 18, 2014, with his cousin, Kajuance. They were waiting in the restaurant for Kajuance's food, and there were six or seven other people there. The door was open and there was a big, clear window just to the right of the door. Kmari saw "two dudes" walk out of the alley and past the open door and window of the restaurant. He could not see their faces at that point, but then one of the guys moved his eyes in the direction of the window so it looked like he was looking in the restaurant. After he looked in, the guy pulled a silver gun from his side, stepped inside the doorway of the restaurant, and pointed the gun "directly at [his] cousin" Kajuance. Kmari "could see [the shooter's] face" and "recognized him" as D-Mac. D-Mac "started to click the trigger," but it "jammed the first two times he clicked it." The third time, the bullet fired, and Kajuance fell in front of the door. The shooter then ran off with the other guy. Kmari explained that he recognized D-Mac because they rode in a van together around December 2013. They were sitting on a long

4

seat, with a friend in between them, and talked for about 15 minutes. Although Kmari didn't know D-Mac's name at the time, he saw his picture on Twitter and that is how he found out he went by the nickname D-Mac.

¶ 11    Lewis moved to suppress the identifications made by Dennis and Kmari, but his motion was denied.

¶ 12    On October 22, 2021, the defense indicated that it planned to call Gregg Stutchman from Stutchman Forensic Laboratory in Napa, California, as an expert witness. Defense counsel said Stutchman would testify as an expert in forensic photogrammetry, "the science of extracting measurements from a photograph or still photo from a video." Stutchman would testify that he conducted a photogrammetric analysis of a still photo from the surveillance footage from Alice's from the night of the shooting, and would opine that the distance "[f]rom the floor to the top of the suspect's head is approximately 71.5" (5'11.5") with his shoes on." The defense argued that Stutchman's "testimony and opinion as to the height of the shooter is crucial to the defense of Mr. Lewis" because Lewis was 5'6" tall at the time of the shooting, making it "physically impossible for [him] to have been the shooter at Alice's *** on the night of July 18, 2014."

¶ 13    The State filed a motion for a *Frye* hearing in response and asked to set aside the testimony of Stutchman, because "there are no criminal cases in Illinois in which there was an expert declared in photogrammetry," and because Stutchman's testimony "would invade the province of the fact finders at trial" as the "jury will be able to view the photo and determine how tall the shooter is compared to the door frame."

¶ 14    On January 7, 2022, the defense filed a motion to allow Stutchman to testify via video at the *Frye* hearing because, according to his treating physician, Stutchman was "unable to travel under any circumstances due to significant and life-threatening health issues."

¶ 15    On January 19, 2022, the court granted the State's request for a *Frye* hearing as well as defense counsel's motion to allow Stutchman to testify via video at the hearing. On February 17, 2022, defense counsel filed a motion for a continuance because Stutchman was unable to testify on that date. The motion was granted and the hearing was reset for March 28, 2022. On that date, defense counsel explained that Stutchman was again unable to testify due to the severity of the side effects of chemotherapy. The defense asked to reset the *Frye* hearing for April 27, 2022. On that date, the State withdrew its request for a *Frye* hearing and indicated that it would not object to Stutchman being called as a witness at trial.

¶ 16    On May 5, 2022, defense counsel filed a motion to allow Stutchman to testify via video at Lewis' jury trial pursuant to Illinois Supreme Court Rule 45. The defense indicated that Stutchman was unable to travel due to his health issues, and argued that the court had the discretion to allow him to testify via video at trial, stating:

> [Stutchman] is not an occurrence witness. He is not a witness that would necessarily need to be seen by the jury for purposes of, perhaps, facial expressions or things of that nature. He's prepared a report and he is ready to explain how he got to the conclusion, his opinion within that report. This is somebody who has testified in other courts, not here in Illinois but in other courts as an expert in the area of forensic photogrammetry as well as other areas of forensic photography and this is extremely important to Mr. Lewis in an effort to allow him to get a fair trial to present a defense that supports our proposition that he is not guilty of this crime. We just don't believe, Judge, that there would be any inconvenience to anyone and we don't think that there should be an issue with him being allowed to testify in this matter."

¶ 17    In response, the State argued that Rule 45 "covers all non-testimonial court appearances" and that "as the finders of fact the jurors themselves must have the opportunity to view Mr. St[u]tchman testify in-person as we would expect all of our expert witnesses to similarly testify in-person." It went on:

> "While we do empathize with Mr. St[u]tchman's present medical condition it's our position that his in-person testimony is essential[], in particular, where 12 ordinary citizens will be the finders of fact as opposed to a Frye hearing where your Honor would be the sole finder of fact of credibility."

¶ 18    The court stated that "Supreme Court Rule 45, which was enacted in March of '20, was specifically geared towards *** the Covid pandemic." It acknowledged that the court had presided over certain Zoom hearings during the pandemic, but made clear that it had not presided via Zoom over anything "substantive." It stated,

> "Now that this building is fully opened to all hearings, anything that is substantive pursuant to *** Judge Evans' general order *** is in-person. I deem this one of those substantive issues. I'm very well-aware of Mr. St[u]tchman's predicament. The Frye hearing is different than for purposes of a jury trial. The defendant has elected and it's his right to elect a jury in this matter. There will be 12 individuals, two alternates that are going to be the triers of fact in this matter. As such, there is a rule -- an instruction *** that the jurors are the triers of the facts and they are the individuals in the position to observe the manner of the witnesses while testifying. That is key, the manner while testifying in-person so *** every single one of those triers of fact [is] able to see the manner of that individual while testifying, that individual's demeanor while that individual is testifying and that will include expressions -- both facial expressions, any responses especially in light of the fact

7

it's not any different than he's an expert witness. I may be repeating myself but facial expressions. There are going to be reports. There will be testifying off of those reports."

The court noted that the State was objecting to Stutchman's virtual testimony, and indicated that the State needed

"to be able to cross-examine that expert. It's not simply a matter of inconvenience **** It is a matter that is pertinent to the trier of the facts in this particular case. **** Rule 45 covered all non-testimonial court appearances. This is testimonial. It is imperative for the triers of fact to assess the credibility of the witness."

The court denied defense counsel's motion.

¶ 19   On May 9, 2022, defense counsel orally requested a continuance based on the court's ruling. He indicated that he had "contacted another expert *** out of Detroit" who could testify in person and generate another report in "about five weeks." Defense counsel stated, "Based on your Honor's ruling we feel we have no choice but to ask for this -- take this action because we believe that this evidence is material, we believe that the defendant would be prejudiced if we were not allowed to present that evidence."

¶ 20   On May 16, 2022, defense counsel filed a written motion to continue. In it, he stated that the defense "will be able to obtain a different expert in photogrammetry and to issue an opinion by June 22, 2022," and argued that "defendant will be prejudiced if he is not allowed to present this evidence which the defense believes is highly relevant and exculpatory." The court granted the continuance.

¶ 21   At a hearing on August 15, 2022, the defense answered "ready" for trial. When the court asked defense counsel if he had any expert witnesses, he said "there will be none."

¶ 22    A jury trial was held on October 5, 6, and 7, 2022. Ezzard Dennis testified that on July 18, 2014, he went to Alice's to pick up food he had ordered. There were about seven or eight people there, including a few kids who were in line placing an order. The kids looked "around 14, 15, 16" and drew Dennis's attention because they "didn't look old enough to be outside that late." While Dennis was waiting for his food, he stood near the wall, close to the door, and was looking outside through the open doorway. He noticed two men coming from the alley who turned onto 43rd street and started walking east past Alice's. Dennis could see them through the large front window of Alice's, and he noticed that both men had hoodies on. He then observed one of the men who walked past outside make eye contact with one of the young kids who was inside waiting to order food. The young man inside of Alice's "panicked" and tried to run behind Dennis for cover, which led Dennis to believe that "[s]omething was about to go down." The man from the street who had made eye contact with the kid inside then entered Alice's with a gun that was "chrome or silver or something like that." Although the shooter had his hooodie on when he entered the restaurant, there was nothing covering his face, so Dennis could see his face. When Dennis saw the shooter draw a gun from his waistband, he "ducked out the way." The shooter then "reached over [him] and shot the other kid in the face." Dennis heard a single gunshot, and saw the boy who was shot laying on the ground, with blood coming out of his mouth and head. The male with the gun ran out. Dennis waited for police to arrive, and gave them his name and identification.

¶ 23    On July 31, 2014, Dennis spoke with police, and told them he thought he could identify the shooter. When he was shown a photo array, he identified Lewis in "approximately a minute", explaining that he was able to do so because "[t]hat's the person [he had] seen *** [h]aving the gun at the restaurant." On October 9, 2014, Dennis returned to the police station to view a live lineup, and again identified Lewis as "the person he saw in the doorway of Alice's Bar-B-Que

9

with a gun[.]" On October 29, 2014, Dennis testified before a grand jury. When he was asked how tall he thought the shooter was, he said, "I'm not for sure. Probably five-seven, -eight or something like that."

¶ 24    Kmari Magnum was also called by the State to testify. When he was asked where he was on July 18, 2014, at approximately midnight, he responded, "I plead the 5th." After the court explained to him, outside the presence of the jury, that he did not have the right to plead the fifth amendment and that he had to answer questions or be subject to contempt of court, Kmari said that he was at Alice's with his cousin Kajaunce on July 18, 2014, and that he had spoken with a detective at the hospital after the shooting. He admitted that he told the detective that the shooter was a black male about 5'6", medium complexion, who was wearing a gray hooded sweatshirt with the hood over his head. Kmari also admitted that he signed a photo advisory form before viewing a photo array, but said he "d[id]n't remember" picking anybody out of the photo array or telling Kajaunce's mother, Trina Morton, that "D-Mac" shot Kajaunce. While Kmari admitted that on September 29, 2019, he went to the police station with his stepfather for an interview, he testified that he told the detectives he "didn't see nobody face." When he was confronted with his previous statements to police, where he said that he saw the shooter's face, that "D-Mac was the person who shot [his] cousin," and that "D-Mac's real name was Denzel Lewis," Kmari said he "d[id]n't remember" making those statements. And while Kmari admitted that he had given a videotaped statement to ASA Thor Martin on October 6, 2014, he said he "d[id]n't remember" or "d[idn]'t recall" making the statements that implicated Lewis as the shooter or that explained how he recognized Lewis based on their prior encounter in a van. Kmari similarly admitted that he "raised [his] hand and swore to tell the truth" before giving grand jury testimony on October 27, 2014, but asserted that he "d[id]n't remember" making statements to the grand jury that implicated

Lewis as the shooter then either. Kmari admitted that he and his mother were relocated from their home into another home by the Cook County State's Attorney's Office in December of 2015, several months after Kmari gave his grand jury testimony.

¶ 25 During cross examination, Kmari said he didn't get a chance to see anybody's face and couldn't tell who the shooter was "because it happened really quick." He claimed the police just "kept coming to get [him]" and that's why he "just gave them what they wanted."

¶ 26 Kmari's videotaped statement and a transcript of his testimony before the grand jury were admitted into evidence. Kajuance's mother, Trina Morgan, and Detective Maresso were recalled to the stand as impeachment witnesses. Trina Morgan testified Kmari told her that the shooter was nicknamed D-mac, and that his real name was Denzel Lewis. Detective Maresso testified about her conversation with Kmari on September 29, 2014, where told her he saw Lewis shoot Kajuance. Maresso also testified that Kmari identified Lewis as the shooter in a photo array, and again in a live lineup on October 9, 2014.

¶ 27 The defense called a single witness, Detective Mark Mendoza. He testified that he created an arrest report for Lewis on October 9, 2014, and wrote down that Lewis was 5'6" tall. He admitted that he never measured Lewis, however, so the height was based solely on his observation. Lewis did not testify.

¶ 28 After the jury returned a guilty verdict, Lewis filed a motion for a new trial, arguing that the court's decision to preclude Stutchman from testifying remotely affected his right to present a defense "where his counsel could have in closing argument argued that the shooter was 5 foot 11 and a half inches tall." The State argued in response that Lewis's motion to allow Stutchman to testify remotely was correctly denied and pointed out that defense counsel "stated on May 9th that

he found another expert from Detroit and *** we got a continuance for this new photogrammetrist" but defense counsel never brought him to court.

¶ 29    The court denied Lewis' motion for new trial, pointing out that the "record is very replete with findings regarding the expert coming in from Detroit" and yet "the defense proceeded and answered ready and demanded [trial] without [testimony from] that specific individual."

¶ 30    At the start of Lewis's sentencing hearing, the State and defense counsel agreed that the sentencing range for the first degree murder charge would be 20 to 60 years, and that the range with the firearm enhancement would be 45 years to life.

¶ 31    The State replayed the video of the shooting using the footage taken from Alice's, read a victim impact statement from Kajuance's mother, and argued the following factors in aggravation: (1) Lewis caused serious harm and showed no regard for the public or for Ezzard Dennis; (2) the victim, Kajuance, was only 16 years old at the time of his death; (3) Lewis had a history of criminal activity: he had been arrested for aggravated robbery and sentenced to 5 years' probation in 2013 and was detained for unlawful possession of a weapon with a defaced serial number several months prior to the shooting. The State noted that the maximum sentence for Lewis would be 40 years due to his age, and asked for the 40-year sentence.

¶ 32    The defense presented a mitigation packet, Lewis's high school diploma, and a number of other certificates Lewis had received while incarcerated. Defense counsel noted that Lewis had a difficult childhood. He never knew his father, witnessed domestic violence, was subject to abuse himself, and moved around a lot, which contributed to his failures in school. After he lost his mother during his freshman year of high school, he was essentially homeless, living with friends or family members and even in the street. Defense counsel pointed out that Lewis was only 16 at the time of the offense, and argued that Lewis had "made so much progress since he has been

incarcerated," displaying good behavior with few exceptions. In light of this mitigation, the defense requested the minimum sentence of 20 years.

¶ 33    The court said it had considered the Presentence Investigation Report (PSI), the mitigation packet, the certificates presented by the defense, the arguments of counsel, and the "history and character of the defendant" as well as the seriousness of the offense "with the objective of restoring the defendant to useful citizenship." In aggravation, the court noted that Lewis had caused serious harm, had a history of prior delinquency, and that the PSI reflected that Lewis had been written up for misconduct while incarcerated on four separate occasions. In mitigation, the court acknowledged that Lewis was only 16 at the time of the offense, that he was "not mature at the time of the offense," and that because of his age, Lewis had been unable to "consider the risk and consequences of his behaviors." The court then discussed Lewis's family background. It noted that Lewis had a difficult childhood; he did not know his father, his mother had been in tumultuous, abusive relationships, Lewis had also been subjected to physical abuse, and he was only 14 years old when his mother passed away, which resulted in him living with various friends and family members. The court acknowledged that Lewis had an individualized education plan, but stated that no evidence of cognitive or developmental disabilities had been presented or any evidence of outside pressure.

¶ 34    When discussing the evidence of rehabilitation and Lewis's potential for rehabilitation, the court noted that Lewis had always been respectful when he came to court and concluded that based on his high school diploma and all of the other certificates he had earned while incarcerated, "there is potential for rehabilitation" and "evidence of rehabilitation." However, the court found the video footage of the shooting "chilling" and said it was a "miracle that as Kajuance was trying to take

cover and use Mr. Ezzard [Dennis] [as a human shield] that Mr. Ezzard [Dennis] was not killed as well."

¶ 35    The court reiterated that the sentencing range for first-degree murder was 20 to 60 years but that the possible sentencing range was 45 years to life because the jury had also found Lewis guilty of the firearm enhancement charge. The court said it was not going to apply the firearm enhancement "because of *** the mitigating factors that I just went through in this particular case," and sentenced Lewis to 37 years. Lewis timely appealed.

¶ 36                                    II. ANALYSIS

¶ 37                                  A. Sufficiency Claim

¶ 38    Lewis argues that the evidence was insufficient to convict him because there was no physical evidence tying him to the scene and because the State's case was based primarily on the testimony of two eyewitnesses, Ezzard Dennis and Kmari Mangun, which he deems unreliable. When reviewing the sufficiency of the evidence, we must determine whether, after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found Lewis guilty beyond a reasonable doubt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71; *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979). "Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside." *Corral*, 2019 IL App (1st) 171501, ¶ 72.

¶ 39    To assess the reliability of eyewitness identification testimony, we use the five-factor test established by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The factors include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the

14

crime and the confrontation." *Id*.; *People v. Slim,* 127 Ill. 2d 302, 307-08 (1989). No single factor is dispositive; instead, all five factors must be considered. *People v. Macklin,* 2019 IL App (1st) 161165, ¶ 22.

¶ 40 First, Lewis argues that Dennis's and Kmari's opportunity to view the shooter at the time of the crime was "brief and extremely limited, under highly stressful and sudden circumstances," which made accurate identification "exceedingly difficult, if not impossible." While it is true that the shooting lasted less than ten seconds, this does not necessarily undermine the reliability of Dennis and Kmari's identifications of Lewis. See, *e.g., People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006) (rejecting defendant's argument that the "brevity of the witness's observation undermines his identification testimony"); *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 45 (finding the evidence sufficient even though one witness saw one of the shooters for only 5 to 10 seconds and another witness observed him for less than 5 seconds); *People v. Macklin,* 2019 IL App (1st) 161165, ¶ 30 (finding that the witness had a "sufficient opportunity to observe" the defendant during the robbery, even though it only lasted for "seconds"). In addition, as is evident from the video footage that was admitted into evidence, Alice's was well lit, nothing obstructed Dennis's and Kmari's view of the shooter, and both witnesses were in close proximity to the shooter. These facts indicate that both witnesses had an adequate opportunity to view the shooter and support the reliability of their identifications of Lewis.

¶ 41 Lewis argues that the fact that the shooter was wearing a hood at the time of the shooting undermines the reliability of their identifications. However, Dennis testified that there was nothing covering the shooter's face, so he could see it. He told police he "believed he could identify the shooter" and then identified Lewis as the shooter, both in a photo array and in a live lineup. See *Barnes,* 364 Ill. App. 3d at 890, 893-95 (finding the evidence sufficient to support an eyewitness's

identification of the defendant even though the shooter wore a hood covering his head and a bandanna covering his face from the tip of his nose down because the witness's identification of the defendant was "positive and consistent in selecting [his] picture from the photo array, in choosing him from a lineup, and in naming [him] as the gunman at trial"). Similarly, Kmari told police that he saw the shooter's face, and said he was "certain" Lewis was the shooter because he "remembered his face" from their van ride together months prior. Although Kmari recanted at trial and said he did not see the shooter's face, his videotaped statement to ASA Martin and a transcript of his grand jury testimony–where he said he saw the shooter's face and identified Lewis as the shooter–were admitted as substantive evidence. As the finder of fact, it was up to the jury to decide which version of Kmari's testimony to believe. *People v. Armstrong,* 2013 IL App (3d) 110388, ¶ 27 ("it is for the trier of fact to weigh the statement, weigh the disavowal and determine which is to be believed").

¶ 42     Next, Lewis argues that the second *Biggers* factor–the witness's degree of attention– "indicates that Dennis' and Kmari's identifications were unreliable." He argues that Dennis was "under the stress of protecting himself from getting shot," and that he was "focused on the gun itself and his self preservation, more than the gunman's face," and that Kmari's "degree of attention was also compromised by the stress inherently associated with the presence of a gun." However, neither witness testified that he was focused solely on the gun. Instead, both witnesses testified that they saw the shooter's face when he entered Alice's, and both were able to positively identify Lewis as the shooter both in a photo array and a live lineup.

¶ 43     Lewis argues that the third factor–the witness's prior descriptions of the criminal–also weighs in favor of finding the identifications unreliable. He notes that witnesses who were interviewed after the shooting "simply described the gunman as an African American male

16

between 16 to 18 years old with a gray hoodie" and that Kmari "failed to immediately mention to police that he knew who the gunman was, though he later told police that he was acquainted with the gunman as someone he followed on Twitter." While the generality of the initial descriptions provided by unnamed witnesses do not bolster Kmari's and Dennis's identifications of Lewis as the shooter, they do not undermine their reliability either, as the descriptions provided, although generic, were consistent with Lewis's age, complexion, and clothing on the night of the shooting. See *People v. Tomei,* 2013 IL App (1st) 112632, ¶¶ 50-52 (finding a witness's description of "two white males wearing dark jackets and dark hats" sufficient to sustain defendant's conviction because the owner made a positive identification and testified that he recognized defendant's face); *In re N.A.,* 2018 IL App (1st) 181332, ¶¶ 27-28 (finding a witness's identification of the defendant reliable even though she described the suspect as a "nondescript, 20 year old who stood between five feet, 10 to 11 inches in height").

¶ 44    Lewis argues that the fourth factor–the witness's degree of certainty–"deserves little weight here." But "expressions of certainty at the time of the initial identification are a relevant indicator of accuracy." *Macklin*, 2019 IL App (1st) 161165, ¶ 32. Shortly after the shooting, Dennis told police he "believed he could identify the shooter" and picked Lewis out of a photo array in "approximately a minute." And Kmari told police that he was "certain" that Lewis was the guy who shot his cousin because he "recognized him," and he picked him out of a photo array and a live lineup. Lewis argues that Kmari "had zero certainty in his prior identification of Lewis" because he recanted at trial and "insisted that he did not see the gunman's face and felt pressured by police to identify Lewis." However, because Kmari's trial testimony, which took place eight years after the shooting, directly contradicted his earlier statements to police and the grand jury, it was up to the jury, as the trier of fact, to determine which of his statements was more credible.

*Armstrong,* 2013 IL App (3d) 110388, ¶ 27; *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 (as the trier of fact, it is within the purview of the jury to "accept or reject all or part of a witness's testimony"). Because "it is for the trier of fact to determine the credibility of the recantation testimony" (*People v. Jackson*, 2020 IL 124112, ¶ 67), and a rational jury could have found Kmari's trial testimony less credible than his earlier statements to the police and the grand jury, we defer to its determination. *People v. Gray*, 2017 IL 120958, ¶ 35 ("a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses"); see also *People v. Green,* 2017 IL App (1st) 152513, ¶¶ 103, 107 (upholding defendant's conviction even though it rested "almost exclusively" on a statement from an eyewitness who later recanted at trial, because "the jury had the opportunity to hear [the witness's] prior statement and observe his testimony recanting the statement, and it determined that [the witness] was telling the truth in his original written statement, as apparent from its verdict").

¶ 45    Kmari's prior familiarity with Lewis also supports the reliability of his identification of Lewis as the shooter. See *People v. Simmons,* 2016 IL App (1st) 131300, ¶ 89 (noting that in addition to the *Biggers* factors, "[o]ur courts also consider whether the witness was acquainted with the suspect before the crime"); *Thompson*, 2016 IL App (1st) 133648, ¶ 35 (finding "the familiarity of two eyewitnesses with [the defendant] personally, support the conclusion that the evidence was sufficient").

¶ 46    Finally, Lewis argues that the fifth factor–the length of time between the crime and the identification–weighs against the reliability of the identifications as well. But Dennis identified Lewis in a photo array less than two weeks after the shooting, and Mangum identified him less than three months later. Our courts have found identifications sufficiently reliable when even more

time has passed. See *e.g*., *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 113-14 (finding an eyewitness identification sufficiently reliable even though it occurred three months after the shooting); *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 22 (affirming defendant's conviction where the witness made an identification within three months of the crime). Lewis argues that Kmari's "prior identification of Lewis as the gunman should be given little to no weight where he steadfastly disavowed it at trial." Again, as noted above (*supra* ¶¶ 35, 38), "it is for the trier of fact to weigh the statement, weigh the disavowal and determine which is to be believed." *Armstrong,* 2013 IL App (3d) 110388, ¶ 27.

¶ 47    The fact that the state produced no physical evidence tying Lewis to the crime does not change the outcome. See *People v. Corral,* 2019 IL App (1st) 171501, ¶ 91 (noting that "physical evidence and a motive for the shooting were unnecessary to corroborate an eyewitness account"); *People v. Herron,* 2012 IL App (1st) 090663, ¶ 23 ("[b]ecause the trial court found [the witness's] identification and testimony to be credible, the lack of physical evidence had no bearing on [the defendant's] conviction").

¶ 48    As a reviewing court, it is not our role to reweigh the evidence or to substitute our judgment for that of the jury, but instead, to determine, after considering the evidence in the light most favorable to the prosecution, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *People v. Wheeler,* 226 Ill. 2d 92, 117-18 (2007). Viewing the evidence in the light most favorable to the prosecution, we find that the State's evidence was sufficient for a rational jury to find beyond a reasonable doubt that Lewis was the shooter. See *People v. Daniel,* 2014 IL App (1st) 121171, ¶ 28 ("A single, reliable eyewitness may be enough to sustain a conviction.") The State presented two eyewitnesses who identified Lewis as the shooter, both in photo arrays and live lineups, within months after the shooting occurred. Both

witnesses had a clear, unobstructed view of the shooter as well as enough time to identify Lewis as the shooter with certainty. Their descriptions of the scene, sequence of events, and the shooting corroborated one other and were supported by the video of the shooting that was admitted into evidence. See *In re J.J.,* 2016 IL App (1st) 160379, ¶ 38 (finding a "video [that] corroborated [an eyewitness's] description of both the events and defendant's hat *** len[t] additional credibility to her testimony").

¶ 49                    B. Order Barring Defense Expert from Testifying Remotely

¶ 50    Lewis argues that the trial court abused its discretion when it declined to allow his proffered expert, Dr. Stutchman, to testify remotely at trial instead of appearing in person. We review a trial court's decision to admit evidence, including expert witness testimony, for an abuse of discretion. *People v. Lerma*, 2016 IL 118496, ¶ 23. We will reverse only if the trial court's ruling was "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera,* 2013 IL 112467, ¶ 37.

¶ 51    At the time of the trial court's ruling, Illinois Supreme Court Rule 45 stated:

> "The court may, upon request or on its own order, allow a case participant to participate in a civil or criminal matter remotely, including by telephone or video conference. Use of telephone or video conferences in criminal or juvenile delinquency matters shall be undertaken consistent with constitutional guarantees applicable to such proceedings." Ill. S. Ct. R. 45 (eff. May 22, 2020).

The Committee Comments to the Rule indicated that "[n]ew Rule 45 recognizes that telephone and video conferences can be used effectively and appropriately in other types of proceedings beyond civil cases" and that "special attention must be given to the use of telephone or video

conferencing in criminal or juvenile delinquency proceedings." Ill. S. Ct. R. 45, Committee Comments (eff. May 22, 2020).

¶ 52    Also in effect at the time of the court's ruling was Cook County Circuit Court General Administrative Order No. 2020-07. Cook County Cir. Ct. GAO 2020-07 (eff. Oct 15, 2021). This order states that for criminal cases, "[j]ury trials shall be held only with all participants physically present in court." Cook County Cir. Ct. GAO 2020-07 I(c)(i)(2); 3(b) ("Except as otherwise ordered by the judge presiding, all matters shall be conducted with all parties and other participants physically present in court.").

¶ 53    The trial court based its decision to deny defense counsel's request to permit Stutchman to testify remotely on Cook County General Administrative Order 2020-07, which requires all jury trials to be conducted in person. The court found it was "imperative" for all witnesses to appear in person so that the State could adequately cross-examine them and so that the triers of fact could assess their credibility. It reasoned that the jury needed to be able to see all witnesses in person to properly evaluate their demeanor. The court also found that Rule 45 applied only to "non-testimonial court appearances" and therefore was inapplicable.

¶ 54    We find that the trial court did not abuse its discretion when it refused to allow Dr. Stutchman to testify remotely. Although the version of Rule 45 in effect at the time of the court's ruling allowed "case participant[s] to participate in a civil or criminal matter[s] remotely," Cook County General Order 2020-07 required "all participants [to be] physically present in court" for jury trials unless the judge presiding decided that an exception was warranted. Although the trial court was "well-aware of Mr. St[u]tchman's predicament," it concluded that an exception was not warranted because the jury needed to be able to see Stutchman's facial expressions and his demeanor in order to properly assess his credibility. For that reason, it denied the defense's motion.

Under the rules in effect at the time, we find that the trial court did not abuse its discretion when it denied defense counsel's request to permit Stutchman to testify remotely.

¶ 55    Moreover, we find Lewis was not prejudiced by the trial court's decision to deny defense counsel's motion because the defense was given ample time to find another expert to testify in person. After the trial court issued its ruling, defense counsel informed the court that he had "contacted another expert *** out of Detroit" who could testify in person and generate another report in "about five weeks." He then filed a written motion to continue, which indicated that the defense would "be able to obtain a different expert in photogrammetry [who could] issue an opinion by June 22, 2022," and argued that "[Lewis] will be prejudiced if he is not allowed to present this evidence which the defense believes is highly relevant and exculpatory." The court granted the continuance.

¶ 56    At a hearing on August 15, 2022, however, defense counsel answered "ready" for trial, although he admitted that he had no expert testimony to present. He did not explain what happened to his photogrammetry expert in Detroit, did not request an additional continuance, and did not renew his request to have Stutchman testify remotely. Nor did counsel present expert testimony from Steve Buller of Stutchman Forensic Laboratory even though Lewis disclosed Buller as the forensic analyst who assisted Stutchman with his photogrammetry report and listed him as a potential expert witness in his answer to the People's motion for pretrial discovery. By electing to proceed to trial without an expert or without renewing its request to have Stutchman testify remotely, requesting an additional continuance, or making any additional arguments regarding prejudice at that point, the defense waived any argument regarding prejudice stemming from the trial court's earlier decision to bar Stutchman from testifying remotely or the lack of expert testimony on photogrammetry in general. See *People v. Martin*, 2021 IL App (4th) 180267, ¶¶ 22-

22

23 (finding that defendant "waived any claim of error or prejudice in the trial court's denial of his motion to continue the trial when he consented to proceed to trial knowing his witness was unavailable," reasoning that a "[d]efendant cannot pursue one course of action before the trial court and then claim error for having done so once he appeals"); *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60 ("It is well settled that a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error.")

¶ 57                                 C. Excessive Sentence

¶ 58     Lewis argues that the trial court abused its discretion when it imposed a 37-year sentence. He argues that the trial court "failed to give proper consideration to th[e mitigation] evidence [he presented] and to [his] youth and associated characteristics or his rehabilitative potential before imposing sentence."

¶ 59     The trial court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We give substantial deference to trial court and will not overturn its sentencing decision absent an abuse of discretion. *People v. Stacey,* 193 Ill. 2d 203, 209 (2000). While a trial court may not ignore evidence in mitigation, it may determine the weight to be given to such evidence. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 63. We presume the sentencing court considered evidence in mitigation at sentencing unless the defendant makes an affirmative showing otherwise (*Burton*, 2015 IL App (1st) 131600, ¶ 38), and we will not substitute our judgment for that of the trial court merely because we would have weighed the sentencing factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50.

¶ 60     Lewis relies on *People v. McKinley*, 2020 IL App (1st) 191907, and *People v. Hill,* 2022 IL App (1st) 171739-B, for support, but both cases are readily distinguishable. In *McKinley,*

23

defendant was convicted of first degree murder when he was 16 years old and sentenced to 100 years in prison, 50 years for the murder and a consecutive term of 50 years' imprisonment for the firearm enhancement. 2020 IL App (1st) 191907, ¶¶ 1, 5. After an unsuccessful appeal and postconviction proceedings, defendant filed a *habeas* petition in federal court. *Id*. ¶ 1. The district court denied the petition but the Seventh Circuit Court of Appeals reversed in light of *Miller v. Alabama,* 567 U.S. 460 (2012), and remanded with instructions to allow the defendant to pursue resentencing in state court. *Id.* After defendant was resentenced to 39 years, he appealed again, arguing that the trial court abused its discretion by "failing to properly consider his youth and its attendant circumstances in conflict with *Miller.*" *Id*. This court agreed, stating that "[e]vidence of defendant's rehabilitation was overwhelming." *Id*. ¶ 73. To reach this conclusion, it highlighted defendant's "impressive education credentials," his status as a "model inmate," the fact that defendant "found time to give back to his community while in prison" and the fact that he showed remorse, apologizing to both the victim's family and the court at resentencing. *Id*. ¶¶ 75-77. After finding that the trial court's "brief, general references to defendant's rehabilitation indicate that the trial judge disregarded the extent of defendant's rehabilitation and did not afford it adequate weight," this court reduced defendant's sentence to 25 years in prison. *Id*. ¶¶ 78, 93. The court reasoned that defendant was "the epitome of an offender who has been restored to useful citizenship" but his sentence "d[id] not reflect this." *Id*. ¶ 79. It stated, "[t]he fact that the trial judge in this case sentenced defendant to one year shy of the maximum prison sentence he could give without the sentence amounting to a *de facto* life sentence, indicates that he failed to give proper weight to defendant's extensive rehabilitation evidence." *Id*. ¶ 80. This court also found that the trial court failed to consider other relevant mitigating factors, including peer pressure,

which the trial court deemed "irrelevant" even though defendant had been "specifically instructed [by his peer] to shoot the victim," and defendant's age. *Id*. ¶¶ 87-90.

¶ 61    In *Hill*, defendant was found guilty of two counts of first degree murder and one count of attempted first degree murder, offenses he committed when he was 15 years old. 2022 IL App (1st) 171739-B, ¶ 1. The trial court sentenced defendant to a mandatory term of life in prison to run consecutively with a 30-year sentence for the attempt, and the sentence was affirmed on appeal. *Id*. After defendant filed a postconviction petition, arguing that his life sentence was unconstitutional, the court resentenced defendant to two concurrent terms of 54 years for first degree murder to run consecutively with a 6-year sentence for attempt. *Id*. The defendant appealed again, and the case went up to our supreme court, which vacated the sentence and directed this court to consider how *People v. Dorsey,* 2021 IL 123010, affected our decision. *Id*. ¶ 3. This court concluded that defendant's new sentence was not a *de facto* life sentence, but found that the trial court abused its discretion when it "minimize[ed] the veritable mountain of evidence explaining the impact of [defendant's] youth and circumstances on his criminal conduct" and failed to adequately consider expert testimony that "explain[ed] [defendant's] ability as an adult to conform his conduct with the law." *Id. ¶* 4. The court made clear that its decision was "not based on the substantive unreasonableness of [defendant's] new sentence" but instead was based on the "trial court's failure to adequately consider the extensive evidence offered by Dr. Cunningham." *Id*. ¶ 50.

¶ 62    Unlike *Hill* and *McKinley*, the trial court here did not fail to consider the mitigating evidence presented by the defense. The court stated that it had reviewed the PSI, "took specific time" to review the mitigation packet, and had reviewed each of the certificates presented by the defense. It also walked through each of the *Miller* factors, including Lewis' age at the time of the

shooting, his family background, evidence of outside pressure, and Lewis's potential for rehabilitation before deciding on a sentence. It noted Lewis' "potential for rehabilitation" based on the certificates presented and evinced its belief that Lewis had been unable to "consider the risk and consequences of his behaviors" due to his age at the time of the shooting. In light of the mitigating evidence presented, the court expressly declined to impose the firearm enhancement, which would have subjected Lewis to a minimum sentence of 45 years to life. Instead, the court sentenced Lewis to 37 years, three years below the 40-year sentence requested by the State, explaining that it found the sentence appropriate due to the seriousness of the offense, the victim's age, the serious harm to the public, and Lewis's criminal history. Because the record reflects that the trial court considered Lewis' age, potential for rehabilitation, and the mitigating evidence presented before deciding on a sentence, we find no abuse of discretion.

¶ 63                                    III. CONCLUSION

¶ 64    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 65    Affirmed.